```
1                   UNITED STATES DISTRICT COURT
2                   SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
3
           CASE NO:  16-cv-22810-SCOLA/Otazo-Reyes
4

5   JANET KRUG and MICHAEL KRUG,

6           Plaintiff,

7   vs.

8   CELEBRITY CRUISES, INC.,

9           Defendant.
    _____/
10

11

12                            14 Northeast 1st Avenue
                              Suite 105
13                            Miami, Florida 33132
                              Tuesday, 10:06 a.m.
14                            April 18, 2017

15

16

17          DEPOSITION OF CAPTAIN JEFFREY PERLSTEIN

18

19          Taken before Corinne Grassini, Florida

20   Professional Reporter, Notary Public in and for the

21   State of Florida at Large, pursuant to Notice of

22   Taking Deposition filed in the above case.

23

24

25
```

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:
     MITCHELL SANCHEZ, LLC
 3   One Galleria Boulevard
     Suite 2121
 4   Metairie, Louisiana 70001
     BY:  Hugo L. Chanez, Esquire
 5

 6   ON BEHALF OF THE DEFENDANT:
     FOREMAN FRIEDMAN, P.A.
 7   2 South Biscayne Boulevard
     Suite 2300
 8   Miami, Florida 33131
     BY:  Darren W. Friedman, Esquire
 9

10                   - - - - - -

11                   I N D E X

12                   - - - - - -

13
     CAPTAIN JEFFREY PERLSTEIN                  PAGE
14   Direct Examination By Mr. Friedman        3
     Cross-examination By Mr. Chanez           53
15   Redirect Examination By Mr. Friedman      61
     Recross Examination By Mr. Chanez         73
16   Further Redirect Examination By Mr. Friedman  75

17
                  EXHIBITS FOR IDENTIFICATION
18
     PLAINTIFF'S                     PAGE
19   NONE

20   DEFENDANT'S                     PAGE
     Letter A Web Site Page          21
21   Letter B LinkedIn Page          25

22

23

24

25
```

```
1      Thereupon,
2                    CAPTAIN JEFFREY PERLSTEIN,
3      was called as a witness and, having been first duly
4      sworn, was examined and testified as follows:
5                    THE WITNESS:  I do.
6                    DIRECT EXAMINATION
7      BY MR. FRIEDMAN:
8           Q.    Good morning.  Can you please state
9      your name for the record.
10          A.    How do you do?
11          Q.    Good morning.  Will you please state
12     your name for the record.
13          A.    Jeffrey Adam Perlstein.
14          Q.    And this deposition was noticed and
15     then subpoenaed duces tecum.  Did you bring
16     documents compliant with those two requests?
17          A.    No, I didn't.  The only request --
18                MR. CHANEZ:  Counsel, for the record,
19                he was served yesterday, I believe at 6:00
20                o'clock, per the local rules, 6:00 p.m.
21                That's not sufficient time for a deposition
22                today.  So we believe the subpoena is
23                invalid.
24     BY MR. FRIEDMAN:
25          Q.    Did you receive the notice of
```

1    deposition that was issued earlier that also had a

2    duces tecum?

3         **A.**    Not that I can recall.

4         **Q.**    Okay.  The attorneys for the plaintiff

5    never shared that notice to you?

6         **A.**    Well, that I be here this time, yes.

7         **Q.**    They never shared the fact that there

8    was a request for you to bring documents with you?

9         **A.**    Negative.  No.

10        **Q.**    It looks like you have a notebook with

11   you.  Can you tell me what that is?

12        **A.**    Just the documentation that I received

13   so far from Mitchell Sanchez.

14        **Q.**    Those are the documents that you

15   reviewed in order to prepare yourself for the

16   deposition today?

17        **A.**    Correct.

18        **Q.**    And to create your opinions in this

19   case?

20        **A.**    I have.

21        **Q.**    Great.  Can I see that, please.

22             MR. CHANEZ:  Counsel, do you have a

23             check for him for his deposition?  We asked

24             that he be paid in advance of his

25             deposition.

```
 1                    MR. FRIEDMAN:  I don't.
 2                    MR. CHANEZ:  We actually advised your
 3               office of payment be made prior to
 4               deposition.
 5                    MR. FRIEDMAN:  We'll provide it.  I
 6               don't believe the rules require that, but a
 7               check will be made.
 8                    MR. CHANEZ:  As long as we agree that
 9               we'll provide subsequent payments, that's
10               fine.
11                    MR. FRIEDMAN:  Yes, no problem.
12                    MR. CHANEZ:  Can we agree that for all
13               the experts, yours and mine?
14                    MR. FRIEDMAN:  That they'll be paid?
15                    MR. CHANEZ:  Yes.
16                    MR. FRIEDMAN:  Of course.
17                    MR. CHANEZ:  I know you requested
18               prepayment on your experts as well, but if
19               we can agree on that, that's fine.
20                    MR. FRIEDMAN:  We'll have to talk to
21               each expert individually, because I have
22               not been dealing with that.  I don't know.
23                    MR. CHANEZ:  Well, we will.
24          BY MR. FRIEDMAN:
25                    Q.   Have you ever been an expert in a
```

1    federal court case before?

2           **A.**   Yes, I have.

3           **Q.**   Because I see here that counsel for

4    the plaintiff, looks like they sent you a copy of

5    an expert report and they wrote to you saying,

6    "This is an expert report in an unrelated case.

7    You can use it so that you can understand the

8    federal court reporting format"?

9           **A.**   I didn't request that.  They sent it,

10   but I understand the federal report format.

11          **Q.**   You understood it --

12          **A.**   Prior.

13          **Q.**   -- before they wrote to you --

14          **A.**   Yes.

15          **Q.**   -- spelling out what you needed to do?

16   Yes?

17          **A.**   Yes, correct.

18          **Q.**   Does this notebook contain everything

19   that you've reviewed in this case?

20          **A.**   Yes, exclusive of the video.

21          **Q.**   And when you say the video, you're

22   talking about the CCTV footage from the vessel that

23   captured the accident?

24          **A.**   Yes.

25          **Q.**   I'm going to ask -- I'm going to let

```
1     you take this home with you now, but I would ask
2     that you make a copy of this and provide it to us.
3     Any problem with that?
4            A.    No.
5            Q.    Okay.  Oh, you know what I didn't see
6     in there, did you bring a copy of your report in
7     this case?
8            A.    I did not bring a copy of my report,
9     no.
10           Q.    Or of your C.V., anything like that?
11           A.    No.  I sent in my C.V. previously.
12           Q.    Okay.  Have you ever had your
13     deposition taken before?
14           A.    Yes.
15           Q.    When?
16           A.    The last was 2015 in Miami.
17           Q.    And what was that about?
18           A.    It was charter yacht that suffered a
19     casualty when she grounded.
20           Q.    Do you recall the name of the
21     individual who took your deposition in that case?
22           A.    No.
23           Q.    Who were you retained by in that case?
24           A.    Brais and Rusak.
25           Q.    That's Keith Brais?
```

1      **A.**    Correct.

2      **Q.**    And Keith Brais is a local plaintiff's

3      attorney?

4      **A.**    He's a Dade County admiralty lawyer.

5      **Q.**    Were you retained by the plaintiff in

6      that case?

7      **A.**    Yes.

8      **Q.**    Can you think of any other depositions

9      you've given in the last five years?

10     **A.**    No.

11     **Q.**    Okay.  So you've been deposed one time

12     in the last five years; correct?

13     **A.**    I believe, correct, yes.

14     **Q.**    Okay.

15     **A.**    Not inclusive of telephonic

16     depositions.  I was deposed by phone at one other

17     time.

18     **Q.**    Tell me about that.

19     **A.**    The case escapes me.  I'm not sure.

20     **Q.**    You recall this phone depo, but you

21     don't recall the facts?

22     **A.**    It was a phone depo.  That's about all

23     I remember.  It was within the last five years, I

24     think.

25     **Q.**    Do you recall who retained you in that

```
 1      case?

 2              A.      No.

 3              Q.      Or what the facts of that case were?

 4              A.      No.

 5              Q.      From the expert report you provided,

 6      it looks like you've been an expert in a total of

 7      eight cases in the last ten years?

 8              A.      Okay.

 9              Q.      Does that sound correct?

10              A.      You have the list.  Yes.

11              Q.      I couldn't help but notice that none

12      of them involved cruise ships; is that correct?

13              A.      That is correct.

14              Q.      Have you ever been an expert in a

15      cruise line case before?

16              A.      No.

17              Q.      It also doesn't look like any of these

18      involved entertainment on board a ship; is that

19      correct?

20              A.      That's correct.

21              Q.      Or a game being played on board the

22      ship?

23              A.      Correct.

24              Q.      Or activities being conducted on board

25      a ship?
```

```
 1                    A.    Correct.

 2                    Q.    So you've never been an expert on a

 3       cruise ship or on any other type of vessel

 4       involving activities, entertainment or games;

 5       correct?

 6                    A.    Correct.

 7                    Q.    What's your business address?

 8                    A.    721 Northwest 77th Avenue, Plantation,

 9       Florida.

10                    Q.    What is the name of that business?

11                    A.    Safeship, one word, Safeship Services,

12       LLC.

13                    Q.    Do you own that business?

14                    A.    I do.

15                    Q.    Are you the only employee?

16                    A.    My wife.

17                    Q.    What is the nature of that business?

18                    A.    I'm a maritime consultant.

19                    Q.    What does that mean?

20                    A.    I bring expertise as far as, again,

21       subject matter expert work.  I'm a flag state

22       surveyor for the Cook Islands and Vanuatu.  I do

23       sea trials.  It's just a way to be able to, you

24       know, process funds for my business.  I'm an

25       instructor of Maritime Professional Training, so
```

```
 1    payment goes through there.  I provide guidance

 2    instruction on flag state regulations,

 3    international conventions, cargo handling, stowage,

 4    stability.  I do on and off hire surveys and I just

 5    started doing some yacht surveys.

 6            Q.    Tell me the name of any client who's

 7    ever hired you to consult regarding activities,

 8    entertainment or games being conducted on board the

 9    ship.

10            A.    None.

11            MR. CHANEZ:  Object to the form of the

12            question, but you can answer that.

13    BY MR. FRIEDMAN:

14            Q.    You said none; correct?

15            A.    None.

16            Q.    Tell me the name of any cruise line

17    you've ever consulted with.

18            A.    None.

19            Q.    You've never worked with either of the

20    firms representing the plaintiff in this case;

21    correct?

22            A.    Celebrity?

23            Q.    No.

24            A.    The firm?

25            Q.    Plaintiff -- plaintiff's firms.
```



```
1              A.    No, I have not.

2              Q.    Of the different things, meaning

3     cargo, stowage consulting, sea trials, flag state

4     surveying, what makes up the largest percentage of

5     your income?

6              A.    As an instructor at Maritime

7     Professional Training.

8              Q.    Instructor in training?

9              A.    No, instructor at Maritime

10    Professional Training.  It is the largest privately

11    owned maritime school in the United States, located

12    in Fort Lauderdale.

13             Q.    And what -- do you teach certain

14    courses there?

15             A.    I do.

16             Q.    What are those courses?

17             A.    This two weeks I have advanced ship

18    handling on the MV full-mission simulator.  I treat

19    -- I teach basic the advanced stability, basic and

20    advanced cargo handling, able-body seaman course,

21    business and law, crowd control and crisis

22    management for a cruise ship personnel.  I do

23    vessel personnel with designated security duties.

24    I teach the ISPS code for individuals who work as a

25    vessel security officer, a company security
```

1    officer, or a facility security officer in

2    compliance with the ISM code and subchapter H or 33

3    CFR.  And I teach the ISM code class, the safety

4    management system class that they offer.

5         **Q.**    Would you agree with me that none of

6    that concerns how to run games, activities, and

7    entertainment on board?

8         **A.**    Oh, no.  I disagree with that.

9         **Q.**    How so?

10        **A.**    Well, crowd control and crisis

11   management, how you would conduct yourselves or

12   have your passengers conduct themselves, but also

13   the requirements of the ISM code, which is --

14   requires vessel to have a safety management system

15   on board, which deals in training and --

16   essentially training and fitness of crew to do

17   their jobs.

18        **Q.**    Okay.  Let's break that down a little

19   bit.

20             So the ISM code requires that cruise

21   lines have a safety management system?

22        **A.**    Correct.

23        **Q.**    Doesn't detail much beyond that.  So

24   what exactly are you talking about when you say

25   that your teaching of the ISM code impacts how

1    entertainment, activities and games can be run on

2    board?

3         **A.**   Because they have a certain

4    responsibility and duty of care to ensure that they

5    have a safe workplace or a safe environment, and

6    that they actively engage in a system where they

7    look for dangerous or other situations that they

8    recognize them and that they take actions to

9    mitigate or remove those unsafe practices or

10   situations from the vessels they work on.

11        **Q.**   You're talking about root cause

12   analysis and corrective actions; correct?

13        **A.**   Well, not only root cause would come

14   into place when there's a casualty, or perhaps a

15   near miss.  But everyone on board should be tasked

16   with the responsibility of being able to look

17   around and assess and recognize unsafe work

18   practices.  Each crew member should have the

19   authority to engage in what we call a stop work

20   order, that is if you see something that's being

21   conducted that's unsafe or unwise, you can raise

22   your hand, the lowest crew member, and say, Hey,

23   let's stop this, let's take a look at this, and

24   let's see why it doesn't look right.

25        **Q.**   And other than sort of those generic



1    terms of let's all try to be safe and look for

2    things that are unsafe, do you ever dive down into

3    the detail of this is how we're going to run this

4    game during your trainings?

5         **A.**    No, it's not that detailed.  No.  It's

6    being able to recognize and take action when an

7    unsafe scenario presents itself.

8         **Q.**    Sure.  Meaning --

9         **A.**    Or staying within the guidelines of an

10   activity.

11        **Q.**    So you do training that says if you're

12   running an entertainment activity on board, you

13   need to know those guidelines and stay within the

14   confines of those guidelines?

15        **A.**    Well, not necessarily just

16   entertainment activity, but any activity that goes

17   on on board that vessel.

18        **Q.**    We're talking about entertainment

19   activities today.

20        **A.**    Well, then it would apply to

21   entertainment activities.

22        **Q.**    I mean, you've been designated as an

23   expert to talk about how the Name That Tune game

24   should be run safely on board.  Do you recognize

25   that --

1           MR. CHANEZ:  Object to the form of the

2       question.

3               You can answer if you can, sir.

4           THE WITNESS:  I'm brought in as an

5       expert to look at how they conducted the

6       game, but also the training that the cruise

7       line provided for employees, which would or

8       would not allow the situation to exist.

9   BY MR. FRIEDMAN:

10      Q.   Okay.  But, again, it's specific to

11  the Name That Tune activity that was being run on

12  board that ship, and specifically how it was run

13  that day; do you understand that?

14          MR. CHANEZ:  Same objection.  You can

15      answer.

16          THE WITNESS:  Well, I'm looking at a

17      best practice and, you know, not to put

18      that individual element under a microscope,

19      but how they conducted themselves that

20      allowed the casualty to occur.

21  BY MR. FRIEDMAN:

22      Q.   Well, how do you know -- or how are

23  you familiar with the best practices with how that

24  game should be run since you've never consulted or

25  worked for any of the major cruise lines?

1    **A.**    Well, I worked for SeaEscape Cruise

2    Lines.  I have been a safety officer aboard two

3    passenger ships.

4    **Q.**    SeaEscape.  Right.

5          SeaEscape, correct me if I'm wrong, is

6    a company that went bankrupt about 20 years ago?

7    **A.**    Well, sir, a lot of companies have

8    gone bankrupt.

9    **Q.**    Was never one of the 20 largest cruise

10    lines in the world?

11    **A.**    Correct.

12    **Q.**    Did it even have overnight sailings?

13    **A.**    Yes, we did.  I was on two ships.

14    **Q.**    Tell me.

15    **A.**    We had a day trip to the Bahamas,

16    where we had full cruise ship venue.  And then we

17    had the second ship, which was two, two, and

18    three-day cruises to the Bahamas.

19    **Q.**    And you served on both those ships?

20    **A.**    I did.

21    **Q.**    What were the names of those vessels?

22    **A.**    The first ship was the ISLAND

23    ADVENTURE and the second ship, I believe, was

24    renamed the ISLAND HOLIDAY.

25    **Q.**    And when were you on the ISLAND

```
1    ADVENTURE?

2            A.    Wow.  Early 1990s for seven months

3    straight.

4            Q.    And what about ISLAND HOLIDAY?

5            A.    That was -- I followed on shortly

6    thereafter for four months.

7            Q.    Say that again.  I didn't understand.

8            A.    I followed on there shortly

9    thereafter.  So after the seven months on one

10   vessel, I had some time off and I did four months

11   on the second vessel.

12           Q.    Okay.  So the entirety of your

13   experience working on cruise vessels was for

14   SeaEscape 20 years ago, for a total of 11 months?

15           A.    And then I went back as captain of the

16   ISLAND ADVENTURE.

17           Q.    When?

18           A.    For four months.

19                 Sometime -- a couple of years after

20   that.

21           Q.    As the captain, you weren't involved

22   in the activities?

23           A.    No.

24           Q.    As the -- I'm sorry, did you say you

25   were safety officer or security officer?
```

1          **A.**     Safety officer.

2          **Q.**     Did they have separate security

3     officers on those vessels?

4          **A.**     Yes, they did.

5          **Q.**     Can you tell me what your duties were

6     as a safety officer on board those vessels?

7          **A.**     I was primarily responsible for

8     training new crew members who came on board and for

9     ensuring that the safety equipment was maintained.

10    And also, I basically was in lounges at night

11    observing what was going on, ensuring that the

12    people were conducting themselves in a safe and

13    efficient manner.

14         **Q.**     Did SeaEscape have a separate

15    entertainment department?

16         **A.**     I'm sure they did.

17         **Q.**     You don't recall one way or the other?

18         **A.**     No, I wasn't involved in the separate

19    entertainment departments.

20         **Q.**     Did they have an activities

21    department?

22         **A.**     It's an assumption, I will say they

23    did.

24         **Q.**     So you don't remember one way or the

25    other?

1          **A.**     They had an activities -- they had an

2     entertainment department.  That had cruise staff

3     departments.

4          **Q.**     So they had a cruise director and

5     cruise staff?

6          **A.**     Yes.

7          **Q.**     And those would be the people

8     responsible for putting games on board?

9          **A.**     Yes.  Traditionally, yes, that would

10    be their responsibility.

11         **Q.**     Did they report directly to the

12    master?

13         **A.**     No, they did not report directly to

14    the master.

15         **Q.**     Do you recall who they reported to?

16         **A.**     No.

17         **Q.**     It wasn't you?

18         **A.**     No.

19         **Q.**     So your position on board those two

20    cruise vessels, you had no responsibility for the

21    on board entertainment and activities; correct?

22         **A.**     Other than seeing that it was

23    conducted safely.

24         **Q.**     How is that your responsibility?

25         **A.**     Well, when we had the Gaucho on board

1    from Argentina, I ensured that the proper fire

2    watch was established because he liked to play with

3    fire.

4         Q.    But in terms of let's say they were

5    playing a Name That Tune game on board, were you

6    going through and checking their script --

7         A.    No.

8         Q.    -- to see -- okay.

9               Were you reviewing how the game was

10   being played?

11        A.    No.  But if I was to be walking around

12   and saw something that I deemed to be unsafe or

13   unwise, I would speak up and engage in some type of

14   corrective action.

15        Q.    Why did you leave SeaEscape?

16        A.    The union pulled us off, pulled me

17   off.  They wouldn't come to a contract negotiation.

18        Q.    Okay.  I'm going to show you what

19   we're going to mark as Defendant's Exhibit A.

20               (Thereupon, Defendant's Exhibit Letter

21        A was marked for identification.)

22   BY MR. FRIEDMAN:

23        Q.    Do you recognize that?

24        A.    Oh, yes.  That's my website.  Well,

25   part of it, right.

1    **Q.**    Can you just flip through it all and

2    make sure that is everything that is in there?

3          **A.**    Looks good.  Looks good.

4          **Q.**    Thank you.

5                Do you agree with me that under the

6    services section of the website for your company,

7    there's no discussion regarding procedures for

8    putting on on board entertainment activities?

9          **A.**    That's correct.  You know, my focus is

10   primarily safety.  So if that would involve safety,

11   then absolutely, yes, it would be within my purview

12   or my abilities.

13         **Q.**    Right.  But I think it's -- I think we

14   understand each other now that when you're

15   discussing safety, you're not getting down to the

16   level of meeting with the activities department to

17   discuss how a game should be played?

18         **A.**    If someone was to bring me aboard as a

19   safety consultant and ask me to review the policies

20   and procedures of how they conduct on board

21   activities, then yes, that's one of the things that

22   I would do.

23         **Q.**    But that's nothing that you've ever

24   done before or been asked to do?

25         **A.**    It's generic safety.  I've been asked

1    to do it in other venues, as far as fall protection

2    or access around hatches or enclosed space.

3         Q.    That's not what we're talking about

4    today.

5              We're talking about a game that was

6    being played on board a ship.  Has any cruise line

7    ever asked you to come on board and review a game

8    that was being played on board and tell them

9    whether or not it's safe or whether safety can be

10   improved?

11        A.    No.  Forgive me.  About 18 months ago,

12   through my employment at Maritime Professional

13   Training, we did a week underway, a three --

14   four-person, five-person team did a week underway

15   with Carnival Cruise Lines where we reviewed their

16   JSA, their job safety analyses.

17        Q.    Okay.  And as part of that, were you

18   asked to review the entertainment department and

19   games that were being played and comment --

20        A.    Not specifically, no, but we went

21   around and we actually observed every -- that we

22   can find, every type of activity that was going on

23   board the vessel.

24        Q.    But not specifically concerning any

25   games that were being played?

```
 1              A.    No, not specifically games.  Overall
 2     vessel safety, which would encompass that.
 3              Q.    And when you talk about your own
 4     maritime subject matter expertise on your website,
 5     you discuss piloting, vessel navigation, ship
 6     handling, mooring equipment, brown tackle, stowage,
 7     cargo handling, vessel stability, hatches, holes,
 8     ramps, watertight doors, I don't notice anything
 9     about the entertainment department or activities or
10     games being played on board; is that correct?
11              A.    That's correct.
12              Q.    You've never served as a cruise
13     director?
14              A.    No.
15              Q.    Never worked in an activities
16     department?
17              A.    No.
18              Q.    Never been the one to actually put a
19     game on board a ship; correct?
20              A.    No.
21              Q.    The game that is being played at this
22     time, have you ever even seen that game being
23     played live?
24              A.    Yes.
25              Q.    Where and when?
```



**JEANNIE REPORTING (305) 577-1705**

```
 1              A.   My wife likes to cruise.  I've been on
 2       eight cruises.
 3              Q.   And so what cruise line were you on
 4       and where did you see that being played?
 5              A.   Royal Caribbean, Disney, Carnival, I
 6       think that's enough.
 7              Q.   And so you've played this game on
 8       board those ships?
 9              A.   Oh, yes.  The game being Name That
10       Tune.
11              Q.   Right.
12              A.   Yes.
13              Q.   Well, is that what you refer to as the
14       game that you witnessed on the video where Ms. Krug
15       was injured?
16              A.   Yes.
17              Q.   All right.  I'm going to show you what
18       we're going to mark as Defendant's Exhibit B.
19                   (Thereupon, Defendant's Exhibit Letter
20              B was marked for identification.)
21       BY MR. FRIEDMAN:
22              Q.   Do you recognize that?
23              A.   LinkedIn; correct?
24              Q.   Yes.  It's your LinkedIn profile;
25       correct?
```

1          **A.**    Yes.

2          **Q.**    Am I correct in reviewing that, that

3     the approximately one year you spent with SeaEscape

4     is your only work experience with any type of

5     passenger cruise vessel?

6          **A.**    Correct.

7          **Q.**    And the only position -- I take that

8     back.

9               It indicates on here that your only

10    position was a safety officer, but that's not

11    correct?

12         **A.**    Correct, yes.

13         **Q.**    I believe you also said you've worked

14    as a master?

15         **A.**    Right.

16         **Q.**    All of these other positions, at least

17    in private employment, all look like they were with

18    cargo ships, commercial vessels?

19         **A.**    Correct.

20         **Q.**    And so your last position with any

21    type of passenger cruise vessel was 20 years ago;

22    correct?

23         **A.**    Yes.

24         **Q.**    I apologize for my own ignorance here.

25    How is it that you were a commander in the Navy at

1   the same time you had private employment?

2           **A.**    Because I was a reservist.  When I

3   graduated from Seaman Maritime College, one of the

4   conditions of my degree and my third mate's license

5   I requested and was granted a commission.

6           **Q.**    Okay.  So this entire Navy career was

7   in the reserves?

8           **A.**    Yes.

9           **Q.**    Would you agree with me your

10  experience is primarily with commercial vessels and

11  not passenger vessels?

12          **A.**    That's correct.

13          **Q.**    And I think specifically it's five

14  years of towing and salvage vessels, then crane

15  ships, container ships and freighters; correct?

16          **A.**    Tankers, spy ships, research vessels.

17          **Q.**    It's safe to assume none of those

18  vessels have entertainment activities on board?

19          **A.**    None.  We played cribbage, you know.

20          **Q.**    Have you ever testified at a trial

21  before?

22          **A.**    No.

23          **Q.**    In this case you -- well, an expert

24  report was provided by you.

25                  Did you type this report yourself?


**JEANNIE REPORTING (305) 577-1705**

1          **A.**     I did.

2          **Q.**     Were you provided copies of reports

3     from the other experts in this case?

4          **A.**     No, I don't believe I received a

5     report at that time.

6          **Q.**     Were you given direction from

7     plaintiff's counsel in terms of the format of what

8     the report should look like?

9          **A.**     No.  No, it was received in the

10    afternoon or evening, I was told it can be brief,

11    and that's what I provided.

12         **Q.**     Did you have any discussions with any

13    other experts in this case?

14         **A.**     We conferenced with Mr. Pecoraro.

15         **Q.**     All right.  Would it surprise you to

16    know that your report and Mr. Pecoraro's report are

17    virtually identical?

18         **A.**     We've reviewed the same information.

19         **Q.**     And did you discuss your opinions with

20    each other?

21         **A.**     I don't truly recall.

22         **Q.**     Did you compare each other's reports

23    prior to providing them to us?

24         **A.**     I don't recall.

25         **Q.**     I'm happy to show them to you, because



1    your reports look almost identical, and the

2    opinions are almost identical, which I've, frankly,

3    never seen before in a case, so I found that

4    unusual.

5         **A.**   We reviewed the same case information.

6         **Q.**   Do you believe you and Mr. Pecoraro

7    have different areas of expertise or

8    qualifications?

9         **A.**   Yes, we do.

10        **Q.**   You've made an opinion that Celebrity

11   failed to provide safety training specific to

12   hosting a guest activity.

13             What is that based on?

14        **A.**   The fact that the -- that they have

15   nothing to show that they provided any training.

16   There is no records.  One of the things we looked

17   for, you have to be able to document the training

18   you provide.  There's just no -- there's no

19   history, there's no guidance, there's no training

20   records.

21        **Q.**   Well, do you know if the person who

22   ran the game had person-to-person training?

23        **A.**   Not that they provided any record of.

24        **Q.**   Do you know whether or not he attended

25   lectures, seminars, courses concerning --

```
 1              A.      Not that they --

 2              Q.      -- safety training?

 3              A.      Not that the cruise line provided any

 4     -- any record of or history of.

 5              Q.      So your opinion is solely because you

 6     haven't seen a record; is that it?

 7              A.      Well, I'm looking for any training

 8     that he may have received.  I also looked at the

 9     activity guidance, which is bereft of anything that

10     deals with any type of safety or hazard analysis,

11     and the fact that the way the injury occurred.

12              Q.      Well, the fact that you would agree

13     with the fact that an injury occurred doesn't

14     necessarily mean that the game was improperly run

15     or is improper training.  We all know accidents can

16     happen; right?

17              A.      Accidents can happen, but also

18     accidents can be caused or that a situation can be

19     developed or created that would encourage an

20     accident to happen.

21              Q.      Okay.  But that's different.

22              I want to make sure I understand.

23     You're not saying that just because an accident

24     happens, that that proves it was failure of

25     training?
```

```
 1              A.    No.   Some accidents are -- some
 2    accidents do happen, some accidents are a result of
 3    a failure of equipment, sound equipment.  But,
 4    again, other accidents happen because people
 5    weren't properly prepared or coached or trained to
 6    perform their duties or to recognize what would be
 7    an unsafe situation.
 8              Q.    Okay.  So now in this case, to make
 9    sure I understand you, the fact that -- strike
10    that.
11              In this case, your opinion that
12    Celebrity failed to provide safety training
13    specific to hosting a game activity is simply
14    because you haven't seen a written document
15    providing training?
16              MR. CHANEZ:  Object to form.
17              You can answer.
18              THE WITNESS:  I have not seen a record
19         providing training.
20    BY MR. FRIEDMAN:
21              Q.    And that is the sole basis for your
22    opinion?
23              A.    That and the fact that he created a
24    scenario which enabled the casualty to occur and
25    that he engaged in an unsafe practice.
```

1    **Q.**   All right.  In your experience with

2    entertainment and activities on board, would you

3    expect there to have been a written procedure

4    detailing every single aspect of how a game like

5    Name That Tune should be run?

6        **A.**   There should be some type of mention

7    that they're conducting the activity in a safe

8    manner and they should have guidelines on how it's

9    performed.

10       **Q.**   Based on what?  I mean, have you

11   worked for any cruise that has had that?

12       **A.**   No, I have not.  But when I worked for

13   SeaEscape, it was prior to the requirements of

14   having an ISM code and the safety management system

15   in place, but it's a best practice.

16       **Q.**   A best practice, again, based on what?

17   You've never worked for a cruise line that had any

18   of this.

19       **A.**   Safety is safety.

20       **Q.**   Safety is safety?

21       **A.**   Safety is safety.  The same way that I

22   would admonish or notify or inform my crew members,

23   and I've done it on a commercial vessel, that you

24   don't run or you don't engage in horseplay, because

25   it's an unstable -- it's a dynamic environment.

1    It's very much the same on passenger vessels.

2    There's some things, no matter what your

3    environment, that you wouldn't do.

4         **Q.**   And it's your opinion that that

5    actually needs to be in writing somewhere?

6         **A.**   It would be part of their training,

7    part of their crew member familiarization.  We

8    don't even have that.  Again, it hasn't been

9    presented.

10        **Q.**   So the fact that you don't have it

11   doesn't mean it doesn't exist; correct?

12        **A.**   I'll be able to formulate a better

13   opinion, should the cruise line provide it.

14        **Q.**   So you would agree with me, though,

15   that your opinion is simply based upon what was

16   provided to you.  It's not necessarily on all

17   information that exists?

18        **A.**   Based on the facts that were presented

19   to me, that's how I can make my opinion.  I can't

20   make an opinion on what hasn't been provided.

21        **Q.**   So you take issue with the fact that

22   they don't have something in writing that says

23   there shouldn't be running on board?

24        **A.**   Or a crew member induction.  They're

25   required to have several layers of training when

1    they come on board the vessel, and I have seen no

2    training concerning this gentleman.  And, again,

3    it's just good situational awareness.  And is there

4    a prohibition against running on a vessel beyond

5    best practices and common sense?  I have not seen

6    it, but they should know and recognize what's an

7    unsafe practice or what's an unsafe condition,

8    whether it be a wet floor or oil on the deck or

9    encouraging people to run on a passenger vessel or

10   any vessel.

11        Q.   Are you saying it's inherently

12   dangerous to run, period?

13        A.   No, I'm not saying that, because some

14   places, the environment is engineered for running.

15   Take the track.  Most of the ships I've been on,

16   they have tracks.  And that's where you're supposed

17   to run.

18        Q.   Is a floor in a night club an

19   inherently dangerous place to run?  I mean, if

20   there's nothing on the floor, there's no spill,

21   there's no oil, there's no water, it's a dry level

22   surface?

23        A.   At any time when you're running on a

24   vessel, it's unwise.  But then you take in the

25   environment and the type of activity, the distance



1    that you run, and what's the expectation.  Also,

2    you know, where you start and where you end.  And,

3    again, a big function of that is the time period

4    involved.  We're not talking about -- we're not

5    talking about --

6         **Q.**   I'm not following what you mean there.

7         **A.**   I mean, as I witnessed the accident

8    from the closed circuit television and the distance

9    involved, all right, the participants were

10   encouraged to run to the stage.  Now, it's human

11   nature, you want to be successful, you want to win.

12   But the problem, as I observed it, is that the

13   distance was short.  So whomever the participant

14   was ran full speed, all right, because they wanted

15   to beat their cruise mates.  And then as soon as

16   they were whatever that individual's top speed was,

17   then they had to break really fast and bend over to

18   get the microphone, all right, moving themselves

19   forward, moving forward the position of lateral

20   resistance and creating the situation where, you

21   know, could easily fall.

22        **Q.**   You watched the video; right?

23        **A.**   Yes, sir.

24        **Q.**   So you know that Ms. Krug started to

25   fall after she took her first step?

**JEANNIE REPORTING (305) 577-1705**

```
1              A.    I saw several steps.

2              Q.    I mean, she wasn't braking.  She

3   wasn't accelerating.  She wasn't approaching the

4   stage as she began to lose balance; right?

5              MR. CHANEZ:  Object to the form.

6              You can answer.

7              THE WITNESS:  I saw her take several

8         steps before she appears to lose her

9         balance.

10  BY MR. FRIEDMAN:

11             Q.    She lost her balance before the point

12  she would have decelerated; correct?

13             MR. CHANEZ:  Object to form.

14             You can answer.

15             THE WITNESS:  I -- the way I witnessed

16        it, she -- she was running and then she

17        began to fall.

18  BY MR. FRIEDMAN:

19             Q.    So let's talk about that a little bit.

20             Do you have any expertise in

21  ergonomics, human factors, accident reconstruction?

22             A.    Just what I've learned in the work

23  environment.  No formal training.  Though accident

24  reconstruction, root cause analysis and corrective

25  action, absolutely, yes, that's part of the
```

```
 1    training in the ISM code or safety management

 2    systems.

 3              Q.   Where in the ISM code does it actually

 4    provide -- well, no, the ISM code wouldn't provide

 5    you with any training.  So what specific training

 6    do you have concerning accident reconstruction and

 7    human factors?

 8              A.   Well, the requirement, all right, to

 9    engage in -- in the ability to recognize

10    casualties, if there are casualties, that you do a

11    -- or a near miss, that you do a root cast

12    analysis, and then if necessary, then we do a

13    corrective action to see that it doesn't happen

14    again.  The whole idea is to -- is to recognize and

15    reduce hazards in the workplace.

16              Q.   Well, it's specific to

17    nonconformities.  It's not generally applicable to

18    a slip and fall type accident; right?

19              A.   If you created a condition, yes.

20              Q.   So you believe that the ISM code

21    specifically would require root cause analysis in a

22    corrective action concerning a slip and fall on

23    board a ship?

24              A.   Yes.  Absolutely.

25              Q.   And it says that in there somewhere?
```

1      **A.**    May I?

2      **Q.**    Of course.

3      **A.**    Thank you.  May I read, please?  It's

4      only a couple of sentences.

5      **Q.**    Sure, just tell me where you are,

6      though.

7      **A.**    Okay.  Section 9 of the ISM code,

8      reports and analysis of nonconformities, accidents

9      and hazardous occurrences.  "The safety management

10     system should include procedures ensuring that

11     nonconformities, accidents and hazardous situations

12     report to the company, investigated and analyzed

13     with the objective of improving safety and

14     pollution prevention.  The company should establish

15     procedures for the implementation of corrective

16     action, including measures intended to prevent

17     reoccurrence."

18     **Q.**    Okay.  So the company should have a

19     procedure where if an accident occurred, they

20     should investigate them?

21     **A.**    Yes.

22     **Q.**    Okay.  And that's all that says?

23     **A.**    Also that they -- that they -- well,

24     no, it addresses maintaining a safe work

25     environment.

```
 1            Q.    Okay.  Did you review Celebrity's SMS?

 2            A.    I requested it.  It wasn't provided.

 3            Q.    Okay.  So you're actually critiquing

 4       their SMS without having reviewed it?

 5            A.    I am critiquing the way they conducted

 6       the activity.

 7            Q.    You gave an opinion that specifically

 8       says there was a failure of the safety management

 9       system, yet you've never reviewed the safety

10       management system; is that correct?

11            A.    I've not reviewed the safety

12       management system.  It was a failure that allowed

13       this to happen.  It was a lack of guidance or

14       oversight or the other crew members who were there

15       who failed to initiate a stop work.

16            Q.    Sir, you specifically said in your

17       first opinion --

18            A.    Yes.

19            Q.    -- "Celebrity's failure to provide

20       safety training specific to hosting a guest

21       activity is a failure of the safety management

22       system," yet you've never reviewed the safety

23       management system?

24            A.    I -- the safety management system has

25       to provide that.  I have seen no documentation.
```

```
 1              Q.    The fact that you haven't seen it
 2     doesn't mean that it doesn't exist.
 3              A.    Well, if -- I can modify my opinion,
 4     should the company provide it.
 5              Q.    But you're comfortable --
 6              A.    Based on the information --
 7              Q.    Are you comfortable going ahead and
 8     telling a federal court judge that there was a
 9     failure of this document even though you've never
10     reviewed the document?
11              MR. CHANEZ:  Object to the form of the
12              question.
13              You can answer, Captain.
14              THE WITNESS:  The form I have is the
15              activity guide, guides for the activity,
16              which addresses nothing about safety.  Hi,
17              how are you, thank you, my name is, that's
18              not much guidance.
19     BY MR. FRIEDMAN:
20              Q.    You never spoke with the person who
21     was actually running the activity; right?
22              A.    I have not.
23              Q.    Nor his supervisor, the cruise
24     director?
25              A.    I have not.
```

**JEANNIE REPORTING (305) 577-1705**

1      **Q.**   And other than the one-page document

2   that I think you're referring to for guidance, you

3   have no idea what actual training or guidance was

4   provided to that individual?

5      **A.**   No, I do not.

6      **Q.**   Your next opinion concerns the

7   encouragement of a hazardous activity, such as

8   running on an unstable moving platform.

9           Did you review the bridge log in this

10   case?

11      **A.**   I requested it.  It has not been

12   provided.

13      **Q.**   Did you review the bridge log in this

14   case?

15      **A.**   I have not.

16      **Q.**   Did you review weather reports for the

17   date of the accident?

18      **A.**   I have not.

19      **Q.**   So do you have any idea whether or not

20   the lounge, the floor in the lounge, was actually

21   unstable and/or moving at the time of the accident?

22      **A.**   Ships are always moving.

23      **Q.**   Unless they're docked?

24      **A.**   They weren't docked.

25      **Q.**   Okay.  Do you know what the conditions

```
1    were?

2           A.    No, I do not.

3           Q.    If a ship is leveled and stable as

4    it's moving, is there a problem with running on a

5    floor surface?

6           A.    Yes, there is.

7           Q.    Why?

8           A.    Because it's unwise.  Because the

9    vessel -- unless it was flat and calm, which I

10   cannot state, all right --

11          Q.    Okay.

12          A.    -- the vessel is always dynamic, the

13   vessel is always moving, there's always motion,

14   there's always some type of movement.  Cruise ships

15   are very small GM.  All right?  They have them made

16   that way so it's not uncomfortable when they roll,

17   but they do roll.

18          Q.    Did that have anything to do with what

19   caused the accident in this case?

20          A.    It could have made her miss her

21   footing.

22          Q.    Did it -- did she tell you that?  Did

23   she testify to that?

24          A.    No.

25          Q.    Do you have any evidence to support
```

1    that the ship, being an unstable and moving

2    platform, had anything at all to do with cause of

3    the accident in this case?

4              **A.**    It can be contributory.

5              **Q.**    Do you have any evidence to support

6    that?  Any testimony, any documents, any

7    affidavits, anything at all --

8                   MR. CHANEZ:  Object to the form.

9    BY MR. FRIEDMAN:

10             **Q.**    -- to support that opinion?

11                  MR. CHANEZ:  Object to the form.

12                  You can answer, Captain.

13                  THE WITNESS:  I have the accident

14              report filled out by the cruise safety

15              officer.

16   BY MR. FRIEDMAN:

17             **Q.**    Which says what?

18             **A.**    It was a bad idea to engage in this

19   activity.

20             **Q.**    That really doesn't have anything to

21   do with my question.

22                  You've made a statement that

23   contributing cause could have been an unstable

24   vessel.  Is there any evidence to support that

25   opinion?

1        **A.**    Not at this time.

2        **Q.**    Your next opinion concerns that

3    Celebrity encouraged individuals to run and then

4    decelerate rapidly, causing them to pitch forward.

5    I, for one, do not personally have any education or

6    experience concerning running, deceleration, and

7    how that causes individuals to pitch.  Can you tell

8    me about your education that allows you to create

9    that opinion?

10        **A.**    Stability.

11        **Q.**    Stability of?

12        **A.**    And how -- and how acceleration loads

13   and when you brake, your body mass, or the mass of

14   any object, continues to move forward.

15        **Q.**    You're talking about ship movement;

16   correct?

17        **A.**    No.  Motion is motion, whether it's a

18   piece of cargo or passengers are pieces of cargo.

19        **Q.**    But your opinion here is because you

20   understand how ships and cargo move, that that

21   translates perfectly to a human running?

22        **A.**    It's -- it's -- it's -- it's -- it's

23   dynamics of the activity.  I mean, I ran track, so

24   I understand -- more than 20 years ago, but I -- at

25   one time I ran track, so I understand how this

1    would affect you.

2          **Q.**    So your education and experience here

3    is based on the fact that you ran track?

4          **A.**    I understand the physiology of

5    standing up and running or surging forward and

6    running or decelerating rapidly.

7          **Q.**    And from your review of the video, is

8    it your opinion that Ms. Krug decelerated rapidly

9    and that was the point at which she pitched

10   forward?

11         **A.**    No.  They created the environment

12   where that was -- could have happened.

13         **Q.**    But did it actually happen?

14         **A.**    She fell when she was encouraged to

15   run.

16         **Q.**    Was she at the point where she was

17   decelerating very rapidly, which then caused her to

18   pitch forward and fall?

19         **A.**    I don't know what she was doing at

20   that time, how hard she was running, what she was

21   processing at that moment, whether she thought she

22   should slow down.

23         **Q.**    So you don't actually know whether or

24   not she was accelerating rapidly and pitched

25   forward and fell down?

1          **A.**     I saw her accelerating rapidly and

2     then I saw her fall.

3          **Q.**     But you didn't see her accelerate

4     rapidly and then pitch forward and fall?

5          **A.**     Accelerated rapidly when she fell.

6          **Q.**     After she had already fallen?

7          **A.**     Yes.

8          **Q.**     You also opine that -- well, you

9     didn't really say whether it's a problem or not,

10    but you noted that the game was conducted in a

11    place where consumption of alcohol was permitted

12    and encouraged.

13               How do you know it was encouraged?

14         **A.**     My experience on cruise lines.  People

15    are always walking around asking if you want a

16    drink.  It's a big part of their revenue.

17         **Q.**     So you don't actually know whether or

18    not any Celebrity employees were encouraging the

19    consumption of alcohol on the date of this

20    accident?

21         **A.**     Bartenders and bar waitresses?

22         **Q.**     You don't know that in this case on

23    this ship in this cruise line.  Your opinion is

24    based on something you witnessed 20 years ago when

25    you worked on SeaEscape?

```
1            A.    Or as recently as perhaps a year ago,

2    when we were on a cruise ship and walking around

3    and offering you drinks at all times in all lounges

4    everywhere.

5            Q.    But you understand your opinion in

6    this case is about this case and --

7            A.    Yes, I understand.  Well, that's some

8    of the experience I bring to the table, is not only

9    as a cruise ship officer or a merchant officer, but

10   also as having been a passenger.

11           Q.    Do you have any evidence, any basis to

12   support your opinion that Celebrity Cruise Line's

13   employees encouraged the consumption of alcohol

14   while this game was being played on the date Ms.

15   Krug was injured?

16           A.    The fact that it's held at a bar.

17           Q.    So that's your exclusive evidence, the

18   fact that the game was being held at a bar;

19   correct?

20           A.    And that alcohol is a big part of

21   cruise line revenue, and that we had a bartender or

22   bar waitress or two.

23           Q.    So that means alcohol was available --

24           A.    Right.

25           Q.    -- but you found it so far as to say
```

1    that consumption of alcohol was encouraged while

2    the game was being played, and I want to know the

3    basis for that.

4          A.    That it's held in a bar and that

5    they're offering drinks.

6          Q.    Did alcohol have something to do with

7    this accident?

8          A.    I don't know.

9          Q.    So then what's the point of that

10   opinion?

11         A.    Because if she had been drinking, and

12   she did have two drinks, I understand, it did --

13   they may not -- you wouldn't want to, you know,

14   take people to a target range after they've been

15   drinking.  You may not want to have people running

16   after they've been drinking.

17         Q.    Okay.  And if she had been drinking,

18   would she be also at fault for her own fall?

19         A.    It depends on how long it's been since

20   the last drink --

21         Q.    Let's say she was --

22         A.    -- and how she processed it.

23         Q.    Let's say she was drinking while the

24   game was being played and she had taken a couple of

25   oxycodone as well.  Do you think that would put her

1   partially at fault for her own fall?

2           MR. CHANEZ:  Object to the form of the

3       question.

4           You can answer if you can, sir.

5           THE WITNESS:  I don't know how she

6       manages consumption of her alcohol or her

7       medication.

8   BY MR. FRIEDMAN:

9       Q.   So then assuming she can manage

10  alcohol and medication and it doesn't affect her --

11      A.   Uh-huh.

12      Q.   -- then there wouldn't be any problem

13  with her being provided alcohol while the game is

14  being played?

15      A.   It might not.

16      Q.   Your next opinion was that Celebrity

17  failed to provide proper supervision to the crew

18  member who was conducting this game.

19          Would you expect there to be his boss

20  standing over him watching him conduct the game?

21      A.   Well, what I initially read is that

22  there was a second crew member there and they

23  believed that he was training him, that he was

24  providing guidance in this activity.

25      Q.   You got that based on what?

1      **A.**    Ms. Krug's deposition.

2      **Q.**    So Ms. Krug told you that she believed

3   this individual was being trained and that somebody

4   else was training him at the time of the accident?

5      **A.**    The second cruise member there, during

6   the activity.

7      **Q.**    That there was another person there.

8   Did she specifically tell you and/or testify that

9   that person was there to train the person who was

10  running the game and how to run the game?

11     **A.**    She believed that he was providing

12  guidance or training to this individual.

13     **Q.**    So your opinion, then, that Celebrity

14  failed to provide proper supervision to the person

15  who was conducting the game is solely based on the

16  fact that the plaintiff in this case had a belief

17  that there was another individual there who was

18  training this crew member in how to play the game?

19     **A.**    Well, supervision doesn't have to be

20  on site or immediate.  Supervision, again, can go

21  back to training and how they prepared them to

22  conduct this.

23     **Q.**    And you don't know how he was trained

24  to conduct this game; do you?

25     **A.**    Not very well, obviously.

1      **Q.**    And then your follow-up opinion is

2    that Celebrity failed to follow industry standards

3    in conducting on board activities.

4              You don't know anything about the

5    industry standards for cruise lines because you

6    haven't worked for a cruise line in 20 years?

7      **A.**    You don't run.  It's a best practice.

8    It's common sense.

9      **Q.**    So your opinion there is solely that

10   it's common sense that you shouldn't run?

11     **A.**    It's a best -- you don't play with

12   matches either, but you can look through all the

13   cruise line regulations, there's nothing that tells

14   you don't play with matches.  You don't play with

15   matches, you don't run on a cruise vessel, you

16   don't sit in stairways.  I mean, it's just things

17   that we normally don't do.  Or if you did see it,

18   as a cruise line member, you would politely ask

19   your guest to not engage in activity.

20     **Q.**    You're not aware of there being

21   anything wrong with the floor where she was

22   running; correct?

23     **A.**    Not that I ascertained.

24     **Q.**    It wasn't unreasonably slippery?

25     **A.**    I couldn't say.

1    **Q.**    There wasn't any spillage of liquid on

2    the floor or oil on the floor?

3    **A.**    I couldn't say.

4    **Q.**    There's no evidence to support that

5    the ship moved and that caused Ms. Krug to fall?

6    **A.**    Not at this time.

7    **Q.**    From your review of the tape, does it

8    -- of the CCTV footage, does it just appear that

9    she lost her balance?

10    **A.**    She fell, yes.  She fell forward.

11    **Q.**    Well, are you able to tell or do you

12    have an opinion as to why she fell?  I mean, people

13    don't just fall.  Something had to cause her to

14    fall.  Does it appear to you that she fell because

15    she lost her balance?

16    **A.**    She fell forward, I'm assuming she

17    lost her balance, yes.

18    **Q.**    Is it possible for people to just lose

19    their balance while running?

20    **A.**    Perhaps.

21    **Q.**    Are you aware of any SMS guidelines or

22    policies for any of the major cruise lines that

23    discusses how on board entertainment games are to

24    be operated?

25    **A.**    No, I'm not aware.



```
 1              Q.   Did any of the other participants in
 2      this game fall?
 3              A.   Not that I witnessed.
 4              Q.   Do you know the microphone that Ms.
 5      Krug was reaching for, do you know how far up off
 6      the floor it was?
 7              A.   Two feet, an estimate.
 8              Q.   What's that based on?
 9              A.   Looking at the video, based on the
10      height of the stage, just over the floor.
11              Q.   So it's your estimate based upon
12      watching the video?
13              A.   Correct.
14              Q.   Nothing else?
15              A.   Correct.
16                   MR. FRIEDMAN:  All right.  I have
17              nothing further.
18                   MR. CHANEZ:  I have a couple of
19              follow-ups.
20                        CROSS-EXAMINATION
21      BY MR. CHANEZ:
22              Q.   What school do you teach at?
23              A.   I teach at Maritime Professional
24      Training in Fort Lauderdale, Florida.
25              Q.   And it's fair to say that you train
```

1    cruise ship personnel?

2         **A.**    I do.

3         **Q.**    So your school has hired you to teach

4    and train cruise ship personnel?

5         **A.**    Yes.

6         **Q.**    As part of that, you have to stay

7    abreast of the industry standards of the cruise

8    ship industry; correct?

9         **A.**    Yes.

10        **Q.**    Okay.  Could you explain to me why is

11   running on a cruise ship a bad idea?

12        **A.**    Because it's a dynamic platform.  You

13   can't say, well, you can run today because it looks

14   like it's calm.  You can't run tomorrow because it

15   may be 2 or 3 feet.  It's just an unsafe activity,

16   and that you have a multitude of different types of

17   floors.  You have tile, you have terrazzo, you have

18   carpet, you have wood.  So the floor changes

19   constantly.  And it's just unsafe to run in an

20   environment where you have other people or

21   obstacles around you.  It's easy to fall.  Most of

22   the injuries that occur are slips and falls.  So

23   you don't want to encourage something that would

24   enable that type of injury or incident to occur.

25        **Q.**    How do you know that most of the

1    injuries that occur are slip and falls caused by

2    running?

3           **A.**    Well, slips and falls, statistically,

4    most of the casualties, I could come up with a

5    statistic if I had on opportunity to research it,

6    but most of the casualties are slips and falls,

7    which are relatively minor unless someone

8    appreciably gets hurt.  Thank God it's not

9    collisions or oil spills.

10          **Q.**    In your training and experience, is

11   that your knowledge in the industry?

12          **A.**    Yes.

13          **Q.**    Okay.  You mentioned a dynamic

14   environment.

15                 What does that really mean?  I don't

16   understand the term.

17          **A.**    That you're always moving.  The vessel

18   is always moving.  That the deck beneath you is

19   always moving.

20          **Q.**    How is running on a vessel different

21   than running on land?

22          **A.**    Because the deck beneath you could or

23   would be moving.

24          **Q.**    Okay.

25          **A.**    And, again, the different types of



```
 1    environments and the obstacles in your way and the
 2    different types of flooring you might encounter.
 3           Q.    Is it your opinion in this case that
 4    had the MC been properly trained, he would not have
 5    conducted the event with a final tie breaking run?
 6                 MR. FRIEDMAN:  Objection to form.
 7                 THE WITNESS:  I absolutely agree with
 8         that.
 9    BY MR. CHANEZ:
10           Q.    Okay.  So I want you to hypothetically
11    assume that opposing counsel produces 11,000 pages
12    of training records.  Does that change your opinion
13    that he was properly trained?
14           A.    No.
15           Q.    Why?
16           A.    Well, first off, on a large vessel
17    like that with 1 or 2,000 crew members, a lot of
18    stuff gets signed off which may not have been
19    completed.  But his actions indicate that he was
20    not properly trained.  If he was properly trained
21    and was able to recognize the hazards associated
22    with the scenario that he created, it would have
23    never been done.
24           Q.    I want you to hypothetically assume
25    that instead of some trivia game, it's run for
```

```
 1    lunch.  Does that make it a safe practice now?

 2           A.    No.

 3           Q.    Doesn't it matter to you what the

 4    trivia game or run for lunch or some other thing

 5    that occurs on the cruise ship for safety purposes?

 6           A.    No.  No, it doesn't matter whether

 7    it's running for lunch or running to answer a

 8    trivia question or running to a number two hatch.

 9    You don't run.  It's just not done.

10           Q.    Okay.  Talk to me a little bit about

11    the stop work for you.  What is that?

12           A.    That it gives any member of the crew

13    from the master down to the lowest rating on board

14    the right, the ability, the authority to look at a

15    situation and address it and say, gentlemen, or

16    ladies, let's stop and take a look at this because

17    I perceive something is unsafe.  And then things

18    stop, we look at it, we discuss it.  And if we have

19    to mediate, we will.  But we'll look at why

20    somebody believed they recognized an unsafe

21    practice and then it's our responsibility to, if it

22    exists, remove that hazard.

23           Q.    You mentioned you have experience of

24    captaining a cruise ship; correct?

25           A.    Yes.
```

1        **Q.**    Part of your duty was overall safety?

2        **A.**    Responsible of safety, security and

3    pollution prevention, as any master.  That's in a

4    nutshell.

5        **Q.**    Okay.  Were you also in charge of the

6    on board procedures for the crew members?

7        **A.**    Yes, training.

8        **Q.**    Okay.  And did that training involve

9    instructing the crew members on not running aboard

10    the ship?

11        **A.**    As captain, you don't get involved in

12    that, you have subordinates who would do that.  But

13    as a safety officer, when you have your induction,

14    you sit down with people and you describe their

15    jobs and you describe the on board safety of the

16    vessel.  That is something that you would address.

17    And as a safety officer on numerous occasions that

18    I told personnel not to run.

19        **Q.**    When you're managing a commercial

20    vessel, you're dealing with trained seamen; right?

21        **A.**    Yes.

22        **Q.**    A cruise ship doesn't have trained

23    seamen; right?

24        **A.**    No.  No.  No.

25        MR. FRIEDMAN:  Objection to form.

1          THE WITNESS:  You have passengers and

2          you have the ship's force.  These are

3          trained seamen.  There's no lesser

4          responsibility.  That may be it's greater

5          because your cargo is human beings.

6    BY MR. CHANEZ:

7          Q.   And that was my point exactly.  Cruise

8    ship passengers are not trained seamen most of the

9    time; are they?

10         A.   I would say none of the time.

11         Q.   So as a master of a vessel, don't you

12   have a heightened duty to protect your passengers

13   on board a cruise ship?

14              MR. FRIEDMAN:  Objection to form.

15              THE WITNESS:  Yes, you do.

16   BY MR. CHANEZ:

17         Q.   You reviewed the discovery request and

18   responses in this case, haven't you, Captain?

19         A.   Yes, sir.

20         Q.   And you've seen what documents were

21   requested from Celebrity Cruises; correct?

22         A.   Yes.

23         Q.   And you've seen all the items that we

24   produced; right?

25         A.   That's all I had to base my opinion

1   on, Counsel.

2       **Q.**   But you would agree that the items you

3   requested have been requested from Celebrity

4   Cruises; right?

5       **A.**   Say it again.

6       **Q.**   You would agree that items that you

7   have not reviewed have at least been requested from

8   Celebrity Cruises?

9       **A.**   That is correct, yes.

10      **Q.**   You were asked about your website.

11      Does your website contain every single

12  little thing that you're an expert on or just a

13  general website?

14      **A.**   No, generalities.

15      **Q.**   Same thing for your LinkedIn profile?

16      **A.**   Same with the LinkedIn profile.  When

17  you look at my website, you know, my 14-year-old

18  helped me with it.  Okay.

19      **Q.**   You've been designated as an expert

20  before in a federal case; haven't you?

21      MR. FRIEDMAN:  Can you say that one

22      more time?  I didn't understand what you

23      said.

24  BY MR. CHANEZ:

25      **Q.**   You've been designated as to a federal

```
 1    case before; haven't you?
 2            A.    Yes.
 3            Q.    Has your testimony ever been limited
 4    or excluded by a federal court?
 5            A.    No, sir.
 6            Q.    Has your testimony ever been limited
 7    or excluded by a state court?
 8            A.    No, sir.
 9            MR. CHANEZ:  That's all I've got.
10                  REDIRECT EXAMINATION
11    BY MR. CHANEZ:
12            Q.    I just have one quick follow-up
13    subject.
14                  Going back to the opinion about
15    running on the cruise ship, there's nothing
16    inherently dangerous, in your opinion, about
17    running; right?
18            A.    In the right environment.
19            Q.    Just generally, generally the act of
20    running, nothing inherently dangerous with that;
21    right?
22            MR. CHANEZ:  Let me object to the form
23          of the question.
24                  But you can answer if you can.
25                  THE WITNESS:  Again, I'll bring it
```

1          back to environment.  I wouldn't run with

2          scissors either.

3     BY MR. CHANEZ:

4          **Q.**   I understand.  But just on a track,

5     because you said running on a cruise ship track is

6     fine with you?

7          **A.**   Correct.

8          **Q.**   Okay.  That's also an unstable

9     environment?

10         **A.**   Again, but they may stop or they may

11    reduce the ability or stop the opportunity -- I'm

12    looking for a word for passengers to run if they

13    thought it was above a, say, a certain sea state.

14         **Q.**   Oh, sure.  I understand that.  Unsafe

15    conditions, it's pouring outside, you're going

16    through a storm, they may close the track?

17         **A.**   Right.

18         **Q.**   But otherwise, you see nothing wrong

19    with running on a track on board a cruise ship?

20         **A.**   It's a specific amenity they provide

21    for some of their guests.

22         **Q.**   Even though that's an unstable

23    platform?

24         **A.**   You're prepared -- you're prepared to

25    run, you've got the proper footwear on, hopefully

1    you're trained as a runner.  And to a runner, maybe

2    that makes it a little more challenging, but

3    they're prepared for it.  You know, I don't believe

4    they get on the track and all of a sudden surprised

5    that the vessel is moving.

6         **Q.**   I didn't follow that.  A person gets

7    on a track and all of a sudden they're surprised

8    that the vessel is moving?

9         **A.**   I don't believe they're surprised.  I

10   don't believe if they're on a cruise ship, right,

11   and they're determined to run, all right, I don't

12   think they would be surprised if they were to find

13   that the vessel was moving.  But, again, they have

14   the proper footwear, they're prepared for it, they

15   thought about it, they've had an opportunity to

16   process it.  They're not brought up as a mass and

17   said, okay, this is what we do next.

18        **Q.**   I think I follow.

19             So your opinion, then, that running is

20   dangerous on a cruise ship is all premised on the

21   fact that the ship can move, which could cause you

22   to lose your balance?

23        **A.**   Providing -- certainly a ship -- we

24   agree the ship can move, which would cause you to

25   lose your balance, yes.



1    **Q.**    But that's why you think it's

2    dangerous to run on a ship?

3         **A.**    Yes.  One of the reasons, yes.

4         **Q.**    So if the ship wasn't moving and if

5    movement of the ship didn't cause the accident,

6    there's nothing inherently wrong with running?

7         **A.**    Running is dangerous because it can

8    lead to trips, it can lead to falls, it can lead to

9    collisions with objects or other passengers.  And

10   then if they said -- and they were on the deck and

11   they said, okay, we're going to do the tie breaker

12   out on a clear open deck, run from the bow to the

13   stern and come back, I don't perceive that as such

14   a dangerous evolution, whereas I witnessed this

15   casualty, people were encouraged to run as fast as

16   they can, and then stop as quickly as they can

17   while bending over for a microphone.

18        **Q.**    Okay.  So --

19        **A.**    That, to me, is -- is -- is -- my head

20   explodes.

21        **Q.**    Let's break that down.  So it can be

22   dangerous because people can collide.  There's no

23   collision in this case; correct?

24        **A.**    The potential exists, so they created

25   the situation.

1      **Q.**    It didn't actually happen.  I'm

2    talking about the actual facts.  Not hypothetical.

3    I'm talking about this case, what actually

4    occurred.  Okay?

5          **A.**    Yes, sir.

6          **Q.**    All right.  Was there a collision?

7          **A.**    Not that I observed.

8          **Q.**    Okay.

9          **A.**    Not that I was able to determine from

10   the video.

11         **Q.**    Did Ms. Krug trip?

12         **A.**    She fell.

13         **Q.**    Did she trip?

14         **A.**    She tripped forward.  She fell

15   forward.  I would --

16         **Q.**    You would agree --

17         **A.**    She fell.

18         **Q.**    -- you can fall without tripping?

19         **A.**    Yes, you can.

20         **Q.**    Do you have any evidence to support

21   that she tripped on something?

22         **A.**    That she tripped on something.

23   Different question.  Not that I saw that she

24   tripped on something.

25         **Q.**    Any evidence that she tripped, period?

```
 1              A.   She tripped and fell forward.   She
 2    fell forward.
 3              Q.   So you believe she fell because she
 4    tripped?
 5              A.   I feel she fell forward because she
 6    was surging forward to be successful in this -- in
 7    the venture, in the game.
 8              Q.   That's not the same as tripping, you
 9    would agree; right?   I mean, I can pull up a
10    dictionary and look up what the word trip means.
11    Do you understand what the word trip means?
12              A.   It's an obstacle, that you fall on
13    something.
14              Q.   Exactly.
15              Did she trip?
16              A.   She fell forward.   I honestly -- she
17    fell.   The end result is she fell.
18              Q.   There's no evidence that she tripped;
19    correct?
20              A.   Okay.   I'll go with there's no
21    evidence she tripped.
22              Q.   And there's no evidence that she
23    collided; correct?
24              A.   Not that I observed on the video.
25              Q.   And there's no evidence of an object
```

1    getting in her way which caused her to fall;

2    correct?

3            **A.**    Not that I observed on the video.

4            **Q.**    And if none of those things occurred

5    and there was no movement of the vessel that caused

6    her to lose her balance, what's the inherent

7    problem in this specific instance with running?

8            **A.**    Because it created the scenario where

9    she was able to fall.  Regardless of what caused

10   her to fall, they created a situation which enabled

11   it to happen.

12           **Q.**    She could have fallen while walking.

13           **A.**    Walking is a safe -- is safe, and we

14   encourage people to walk.

15           **Q.**    Do people trip and fall while walking?

16           **A.**    Sometimes they do.

17           **Q.**    Do they slip and fall while walking?

18           **A.**    Sometimes they do.

19           **Q.**    Do they lose their balance while

20   walking?

21           **A.**    Sometimes they do.  But we don't want

22   to encourage scenarios which would increase the

23   chance of a casualty, which we recognize that and

24   you do not do it.

25           **Q.**    So in this case, where there wasn't a

 **JEANNIE REPORTING (305) 577-1705**

1    collision, there wasn't a slip, there wasn't a

2    trip, and there was no movement of the vessel, the

3    reason you believe it's dangerous, what we're left

4    with, is because of the rapid acceleration, then a

5    rapid deceleration, causing her to pitch forward

6    and lose her balance?

7          **A.**    Yes.

8          **Q.**    And you believe that your expertise

9    enables you to render that opinion?

10         **A.**    My expertise says that she was placed

11   in an unsafe situation that should have never

12   occurred.  That's the failure of crew training.

13         **Q.**    Yet you don't know anything about the

14   actual training that these individuals received?

15         **A.**    Well, if they did receive training, it

16   was insufficient.

17         **Q.**    Well, people can be --

18         **A.**    Or it wasn't effective, because he

19   still did it.

20         **Q.**    Do people never do things that goes

21   against their training?  Do people never make

22   mistakes?

23              MR. CHANEZ:  Object to the form of the

24              question.

25

```
1    BY MR. FRIEDMAN:

2         Q.    I want to make sure I understand that

3    that's your opinion here.  Does the fact that an

4    accident occurred to you mean there's a failure in

5    training automatically?

6         A.    Not automatically, no.  Some accidents

7    happen in spite of our best efforts to keep them

8    from happening.  But this accident happened because

9    a scenario was presented which enabled, or almost

10   encouraged it to happen.  If she wasn't told to

11   run, which I don't think there's any discussion

12   that you don't run on cruise ships, this scenario,

13   the accident would never have happened.

14        Q.    And what is it specific to -- about

15   this being a cruise ship that caused the accident?

16        A.    Any ship.

17        Q.    Or any ship?

18        A.    Any ship.  You don't run on any ship.

19        Q.    What is it specific about this being a

20   ship that caused this accident?

21        A.    It's just unwise to do so.  It's a

22   best practice.  It's a standard.

23        Q.    You're talking --

24        A.    There's a certain duty of care to not

25   create a scenario where people can be injured.  And
```

```
 1    if he hadn't said, okay, this is my idea of a tie

 2    breaker, I want you to run to the stage, we

 3    wouldn't be here.

 4            Q.   If they were running this at a lounge

 5    across the street, would that have been okay?  Is

 6    that safe?

 7              MR. CHANEZ:  Object to the form of the

 8              question.

 9    BY MR. FRIEDMAN:

10            Q.   I mean, what I'm trying to figure out

11    is, is it your opinion that it's dangerous because

12    it was on a cruise ship, or just generally, people

13    shouldn't run?

14              MR. CHANEZ:  Again, object to the

15              form.

16              You can try and answer.

17              THE WITNESS:  Again, we don't run on

18              cruise ships.

19    BY MR. FRIEDMAN:

20            Q.   Okay.  That's not my question.

21            A.   I think the scenario presented, if she

22    had been -- and the group was told, okay -- again,

23    she could have fallen, but you know, run to the

24    other side of the room and touch the wall.

25            Q.   I'm asking you to answer the actual
```



1    question that's been asked.

2          **A.**   One more time, repeat your question.

3          **Q.**   Sure.

4               Is the game that's being played where

5    they were encouraged to run, is it your opinion

6    that it was dangerous specifically because it was

7    being played on a cruise ship as opposed to

8    anywhere else in the world?

9          **A.**   It made it more dangerous.

10         **Q.**   Because of all the potential things

11   that could have happened, but didn't actually

12   happen in this case?

13         **A.**   Well, I -- I -- looking for words.  I

14   just, you know, need to reiterate that they created

15   the scenario.  I can't get away from the fact that

16   the way I see it, they enabled the casualty.

17         **Q.**   I understand.  And you've said that

18   because it's a moving platform and collisions can

19   occur and trips can occur, but none of those things

20   actually happened here.

21         **A.**   The dynamics of running on short

22   distance bent forward with the anticipation of

23   bending over and getting that microphone, that was

24   the dynamics I saw on her and the other passengers.

25         **Q.**   So then your opinion is solely based



1    upon human dynamics of running short distances?

2         **A.**    And the scenario where they had to run

3    a short distance and touch a wall, would've been

4    completely different than running a short distance

5    where you're bent over and you have your momentum

6    and your lateral center of buoyancy -- of gravity

7    and where you just fall forward.

8         **Q.**    Okay.  And you believe you're

9    qualified to testify regarding human running

10   dynamics?

11        **A.**    Yes.

12        **Q.**    Okay.  And what exactly qualifies you,

13   again, regarding human running dynamics?

14        **A.**    I walk, I run, I fall.

15        **Q.**    Because you're human, you believe

16   you're qualified to be an expert?

17        **A.**    And my experience on vessels,

18   commercial vessels, cargo vessels, and passenger

19   vessels.  I mean, we can't dispute the fact that

20   it's unwise to run on a ship.

21        **Q.**    Have you taken any course work on

22   human dynamics, movement, running?

23        **A.**    No.

24        **Q.**    How bodies react to situations when

25   they're running, anything at all relevant to the

```
 1    opinion you just gave?
 2              A.    Personal physiological experience.
 3              MR. FRIEDMAN:  Okay.  I have nothing
 4         further.
 5                    RECROSS EXAMINATION
 6    BY MR. CHANEZ:
 7              Q.    I have follow-ups.
 8              Captain, let's go through the chains
 9    here.  If Celebrity doesn't bait Ms. Krug into
10    running towards the stage, does the accident
11    happen?
12              MR. FRIEDMAN:  Object to the form.
13              THE WITNESS:  No.  That's the crux of
14         why we're here.  It shouldn't have
15         happened.
16    BY MR. CHANEZ:
17              Q.    And based on your training and
18    experience, cruise ship safety, you're not supposed
19    to bait the guest to run towards the stage; right?
20              MR. FRIEDMAN:  Objection to form.
21              THE WITNESS:  Correct.
22    BY MR. CHANEZ:
23              Q.    That's a lack of care towards the
24    guest; right?
25              MR. FRIEDMAN:  Objection to form.
```

```
1                    THE WITNESS:  Again, lack of care to
2              the duty of care towards the safety of our
3              guests, and, again, a lack of -- where I
4              perceive a lack of training which enabled
5              this crew member to determine that was okay
6              to do.
7     BY MR. CHANEZ:
8              Q.   It also lacks provision that nobody
9     stopped them?
10             A.   Correct.
11                  MR. FRIEDMAN:  Object to the form.
12    BY MR. CHANEZ:
13             Q.   And you've seen this game played many
14    times before?
15             A.   Yes.
16             Q.   You were recently hired to consult
17    Carnival Cruises?
18             A.   We did.  Yes, about a year ago we did
19    a job safety analysis on the Carnival Cruise Line
20    ship.
21             Q.   And you observed all aspects of the
22    vessel?
23             A.   Everywhere.
24             Q.   Including some of the entertainment?
25             A.   Yes.
```

1          **Q.**    And did you ever experience anybody

2     encouraging guests to run towards the stage?

3          **A.**    Never saw that.

4          **Q.**    Had you experienced that, what would

5     you have taken as a corrective action?

6          **A.**    That we recognize a hazardous

7     situation and that we have to, again, engage in a

8     corrective action, which would be to stop it and to

9     educate and train our crew that we don't do this

10    because it creates an unsafe situation.

11         **Q.**    As part of your training and

12    experience and professional work as a safety

13    officer, you have to understand how bodies react to

14    running; right?

15              MR. FRIEDMAN:  Objection to form.

16              THE WITNESS:  Yes.

17    BY MR. CHANEZ:

18         **Q.**    Okay.  So you used -- you brought all

19    your training, experience and education to your

20    opinions in this case as to how the incident

21    occurred; right?

22         **A.**    Correct, sir.

23              MR. CHANEZ:  Nothing further.

24              FURTHER REDIRECT EXAMINATION

25

```
 1   BY MR. FRIEDMAN:

 2          Q.    Let's talk briefly about this job

 3   safety analysis for Carnival.

 4                Who retained you?

 5          A.    Well, I was in the employ of Maritime

 6   Professional Training.  Their client was Carnival

 7   Cruise Lines.

 8          Q.    What specifically were you personally

 9   asked to do?

10          A.    I went around, I observed the crew

11   members performing their jobs.  I asked them about

12   the jobs they performed.  We specifically looked at

13   personal protective equipment that was used in the

14   performance of the job, and basically to ensure

15   they had a safe work environment in which they

16   conducted their jobs.

17          Q.    Which crew departments?

18          A.    Every department.

19          Q.    You went around and met with

20   individuals from every single department on board

21   that ship?

22          A.    That is correct.

23          Q.    How many individuals did you

24   interview?

25          A.    On a week, maybe 100, maybe 50, 75.
```

1          **Q.**    What ship were you on?  Was it one

2     ship?

3          **A.**    One ship.  I want to say it was the

4     VALOR.  She was out -- that's probably wrong, but

5     she was out of Port Canaveral.

6          **Q.**    I'm not fully understanding what you

7     were asked to do here.

8              So did you go sail on one ship for a

9     week?

10         **A.**    Correct.

11         **Q.**    Were you with a team of people?

12         **A.**    I was.

13         **Q.**    So you spent a week aboard a ship,

14    you're not sure which ship, possibly the VALOR, and

15    you walked around, you interviewed the crew and you

16    looked at their personal protective equipment?

17         **A.**    Well, we looked at their work

18    environment, watched them perform their jobs.  We

19    looked at any PPE they may or may not have been

20    using.  And, again, we use that, we turned in a

21    report which was used to help formulate corrective

22    actions or develop safe work practices.

23         **Q.**    Okay.  And as part of that, you

24    interviewed people from the entertainment

25    department?

1          **A.**    Yes.

2          **Q.**    The activities department?

3          **A.**    Yes.

4          **Q.**    Okay.  Tell me the name of anyone you

5     met with.

6          **A.**    I don't have anyone's name.

7          **Q.**    And when you interviewed those people,

8     did you ask them, tell me about the games you're

9     running on board?

10         **A.**    I asked them how do you do your job.

11         **Q.**    That's all you said?

12         **A.**    How do you perform your job.  What

13    does your job entail.  Whom do you work for.

14         **Q.**    Who is your supervisor and what is

15    your job?

16         **A.**    That was part of it.  Yes.  It was a

17    detailed list, but yes.

18         **Q.**    Well --

19         **A.**    Essentially a checklist that we went

20    through.

21         **Q.**    Do you have that somewhere, that

22    checklist?

23         **A.**    No, I don't.  I turned in all my

24    documentation.  It's proprietary.

25         **Q.**    Who has that?

1      **A.**    Now Carnival, I would assume.

2      **Q.**    Did you meet with any individuals

3   within the activities department, cruise director,

4   cruise staff and say to them tell me about the

5   games you're running on board and specifically how

6   you run those games?

7      **A.**    No.  It was more of a work environment

8   behind stage, the storage of equipment access, as

9   far as the cruise department was concerned.  But we

10   watched shows, I mean, and we watched activities

11   being performed with the eye on -- again, our

12   professional eye is to look for unsafe conditions.

13          MR. FRIEDMAN:  Nothing further.  All

14          right.  Thank you, sir.

15          MR. CHANEZ:  We're done.

16          MR. FRIEDMAN:  We'll order.

17          (Thereupon, the deposition was

18          concluded at 11:25 a.m.)

19

20

21

22

23

24

25

80

```
 1                CERTIFICATE OF SHORTHAND REPORTER

 2

     STATE OF FLORIDA      )
 3                         )  SS.
     COUNTY OF MIAMI-DADE)

 4

                   I, Corinne Grassini, Florida
 5   Professional Reporter, do hereby certify that I was
     authorized to and did stenographically report
 6   deposition of CAPTAIN JEFFREY PERLSTEIN, that a
     review of the transcript was requested; and that
 7   the foregoing transcript, pages 1 through 79 is a
     true record of my stenographic notes.

 8

                   I FURTHER CERTIFY that I am not a
 9   relative, employee, or attorney, or counsel of any
     of the parties, nor am I a relative or employee of
10   any of the parties' attorney or counsel connected
     with the action, nor am I financially interested in
11   the action.

12                 DATED, this 25th day of April 2017.

13

14

     _____
15   CORINNE GRASSINI
     Florida Professional Reporter
16

17

18

19

20

21

22

23

24

25
```

```
 1                     CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA

 4    COUNTY OF DADE

 5

 6

 7              I, the undersigned authority, certify

 8    that CAPTAIN JEFFREY PERLSTEIN personally appeared

 9    before me and was duly sworn.

10              WITNESS my hand and official seal this

11    25th day of April, 2017.

12

13

14

15    _____

16    CORINNE GRASSINI
      Notary Public State of Florida
17    My commission Expires:  11-16-18
      Commission #FF 173745
18

19

20

21

22

23

24

25
```

**JEANNIE REPORTING (305) 577-1705**

1                          JURAT PAGE

2     STATE OF FLORIDA  )
                          )SS.
3     COUNTY OF DADE     )

4

5

6                   I, hereby certify that I have read

7     the foregoing transcript pages 1 to 79 and find

8     the same to be true and accurate.

9                   Any corrections made by me are set

10    forth on the errata page attached hereto.

11

12

13                   _____

14                   (CAPTAIN JEFFREY PERLSTEIN)

15

16    Sworn to and subscribed before me on this,
      _____ day of _____, 2017.
17

18    _____
      Notary Public in and for the
19    State of Florida at Large.
      My Commission expires:
20

21

22

23

24

25

 **JEANNIE REPORTING (305) 577-1705**

```
 1                JEANNIE REPORTING
                28 West Flagler Street
 2                    Suite 610
                 Miami, Florida 33130
 3

 4

 5       TO: CAPTAIN JEFFREY PERLSTEIN
         C/O HUGO L. CHANEZ, ESQUIRE
 6       MITCHELL SANCHEZ, LLC
         One Galleria Boulevard
 7       Suite 2121
         Metairie, Louisiana 70001
 8

 9       April 25, 2017

10       IN RE: JANET KRUG v. CELEBRITY
         CASE NO: 16-cv-22810-SCOLA/Otazo-Reyes
11
         Dear CAPTAIN JEFFREY PERLSTEIN,
12
         With reference to the examination of YOURSELF,
13       deponent in the above-styled cause, taken on
         April 18, 2017 under oath, please be advised
14       that the transcript of the Deposition has been
         transcribed and is awaiting your signature.
15
         Please arrange to conclude this matter at your
16       earliest convenience.  We would suggest that
         you telephone this office and arrange an
17       appointment suitable for all concerned.

18       However, if this has not been taken care of by
         May 25, 2017 we shall conclude the reading and
19       signing of said deposition has been waived, and
         shall then proceed to file the original of the
20       said transcript with the party who took the
         deposition, without further notice to any
21       parties.

22                    Sincerely,

23
         _____
24               Corinne Grassini, FPR

25       cc: All Counsel of Record.
```

```
 1                          ERRATA SHEET

 2

     F.R.C.P. RULE 1.310 PROVIDES IN PART:
 3        (e)"...Any changes in form or substance that
     the witness wants to make shall be entered upon
 4   a separate correction page by the officer with
     a statement of the reasons given by the witness
 5   for making them..."

 6

      PAGE/LINE          CHANGE/CORRECTION   REASON
 7

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20

21   I, _____, do hereby certify that
     I have read the foregoing transcript of my
22   deposition, given on April 18, 2017, and that
     together with any additions or corrections made
23   herein, it is true and correct.

24          _____
            CAPTAIN JEFFREY PERLSTEIN
25
```

 **JEANNIE REPORTING (305) 577-1705**

## 1

**1** [3] - 56:17, 80:7, 82:7
**1.310** [1] - 84:2
**100** [1] - 76:25
**105** [1] - 1:12
**10:06** [1] - 1:13
**11** [1] - 18:14
**11,000** [1] - 56:11
**11-16-18** [1] - 81:17
**11:25** [1] - 79:18
**14** [1] - 1:12
**14-year-old** [1] - 60:17
**16-cv-22810-SCOLA/ Otazo-Reyes** [2] - 1:3, 83:10
**173745** [1] - 81:17
**18** [4] - 1:14, 23:11, 83:13, 84:22
**1990s** [1] - 18:2
**1st** [1] - 1:12

## 2

**2** [2] - 2:7, 54:15
**2,000** [1] - 56:17
**20** [7] - 17:6, 17:9, 18:14, 26:21, 44:24, 46:24, 51:6
**2015** [1] - 7:16
**2017** [8] - 1:14, 80:12, 81:11, 82:16, 83:9, 83:13, 83:18, 84:22
**21** [1] - 2:20
**2121** [2] - 2:3, 83:7
**2300** [1] - 2:7
**25** [3] - 2:21, 83:9, 83:18
**25th** [2] - 80:12, 81:11
**28** [1] - 83:1

## 3

**3** [2] - 2:14, 54:15
**33** [1] - 13:2
**33130** [1] - 83:2
**33131** [1] - 2:8
**33132** [1] - 1:13

## 5

**50** [1] - 76:25
**53** [1] - 2:14

## 6

**61** [1] - 2:15
**610** [1] - 83:2
**6:00** [2] - 3:19, 3:20

## 7

**70001** [2] - 2:4, 83:7
**721** [1] - 10:8
**73** [1] - 2:15
**75** [2] - 2:16, 76:25
**77th** [1] - 10:8
**79** [1] - 80:7, 82:7

## 9

**9** [1] - 38:7

## A

**a.m** [2] - 1:13, 79:18
**abilities** [1] - 22:12
**ability** [3] - 37:9, 57:14, 62:11
**able** [10] - 10:23, 12:20, 14:16, 15:6, 29:17, 33:12, 52:11, 56:21, 65:9, 67:9
**able-body** [1] - 12:20
**aboard** [4] - 17:2, 22:18, 58:9, 77:13
**above-styled** [1] - 83:13
**abreast** [1] - 54:7
**absolutely** [4] - 22:11, 36:25, 37:24, 56:7
**accelerate** [1] - 46:3
**accelerated** [1] - 46:5
**accelerating** [3] - 36:3, 45:24, 46:1
**acceleration** [2] - 44:12, 68:4
**access** [2] - 23:2, 79:8
**accident** [24] - 6:23, 30:20, 30:23, 35:7, 36:21, 36:23, 37:6, 37:18, 38:19, 41:17, 41:21, 42:19, 43:3, 43:13, 46:20, 48:7, 50:4, 64:5, 69:4, 69:8, 69:13, 69:15, 69:20, 73:10
**accidents** [10] - 30:15, 30:17, 30:18, 31:1, 31:2, 31:4, 38:8, 38:11, 69:6

**accurate** [1] - 82:8
**act** [1] - 61:19
**action** [10] - 15:6, 21:14, 36:25, 37:13, 37:22, 38:16, 75:5, 75:8, 80:10, 80:11
**actions** [4] - 14:8, 14:12, 56:19, 77:22
**actively** [1] - 14:6
**activities** [22] - 9:24, 10:4, 11:7, 13:6, 14:1, 15:19, 15:21, 18:22, 19:20, 20:1, 20:21, 22:8, 22:16, 22:21, 24:9, 24:15, 27:18, 32:2, 51:3, 78:2, 79:3, 79:10
**activity** [23] - 15:10, 15:12, 15:16, 16:11, 23:22, 29:12, 30:9, 31:13, 32:7, 34:25, 39:6, 39:21, 40:15, 40:21, 41:7, 43:19, 44:23, 49:24, 50:6, 51:19, 54:15
**actual** [4] - 41:3, 65:2, 68:14, 70:25
**Adam** [1] - 3:13
**additions** [1] - 84:22
**address** [3] - 10:7, 57:15, 58:16
**addresses** [2] - 38:24, 40:16
**admiralty** [1] - 8:4
**admonish** [1] - 32:22
**advance** [1] - 4:24
**advanced** [3] - 12:17, 12:19, 12:20
**ADVENTURE** [3] - 17:23, 18:1, 18:16
**advised** [2] - 5:2, 83:13
**affect** [2] - 45:1, 49:10
**affidavits** [1] - 43:7
**afternoon** [1] - 28:10
**ago** [8] - 17:6, 18:14, 23:11, 26:21, 44:24, 46:24, 47:1, 74:18
**agree** [14] - 5:8, 5:12, 5:19, 13:5, 22:5, 27:9, 30:12, 33:14, 56:7, 60:2, 60:6, 63:24, 65:16, 66:9
**ahead** [1] - 40:7
**alcohol** [12] - 46:11, 46:19, 47:13, 47:20, 47:23, 48:1, 48:6, 49:6, 49:10, 49:13
**allow** [1] - 16:8
**allowed** [2] - 16:20,

39:12
**allows** [1] - 44:8
**almost** [3] - 29:1, 29:2, 69:9
**amenity** [1] - 62:20
**analyses** [1] - 23:16
**analysis** [8] - 14:12, 30:10, 36:24, 37:12, 37:21, 38:8, 74:19, 76:3
**analyzed** [1] - 38:12
**answer** [13] - 11:12, 16:3, 16:15, 31:17, 36:6, 36:14, 40:13, 43:12, 49:4, 57:7, 61:24, 70:16, 70:25
**anticipation** [1] - 71:22
**apologize** [1] - 26:24
**appear** [2] - 52:8, 52:14
**APPEARANCES** [1] - 2:1
**appeared** [1] - 81:8
**applicable** [1] - 37:17
**apply** [1] - 15:20
**appointment** [1] - 83:17
**appreciably** [1] - 55:8
**approaching** [1] - 36:3
**April** [6] - 1:14, 80:12, 81:11, 83:9, 83:13, 84:22
**areas** [1] - 29:7
**Argentina** [1] - 21:1
**arrange** [2] - 83:15, 83:16
**ascertained** [1] - 51:23
**aspect** [1] - 32:4
**aspects** [1] - 74:21
**assess** [1] - 14:17
**associated** [1] - 56:21
**assume** [4] - 27:17, 56:11, 56:24, 79:1
**assuming** [2] - 49:9, 52:16
**assumption** [1] - 19:22
**attached** [1] - 82:10
**attended** [1] - 29:24
**attorney** [3] - 8:3, 80:9, 80:10
**attorneys** [1] - 4:4
**authority** [3] - 14:19, 57:14, 81:7
**authorized** [1] - 80:5
**automatically** [2] - 69:5, 69:6

**available** [1] - 47:23
**Avenue** [2] - 1:12, 10:8
**awaiting** [1] - 83:14
**aware** [3] - 51:20, 52:21, 52:25
**awareness** [1] - 34:3

## B

**bad** [2] - 43:18, 54:11
**Bahamas** [2] - 17:15, 17:18
**bait** [2] - 73:9, 73:19
**balance** [12] - 36:4, 36:9, 36:11, 52:9, 52:15, 52:17, 52:19, 63:22, 63:25, 67:6, 67:19, 68:6
**bankrupt** [2] - 17:6, 17:8
**bar** [5] - 46:21, 47:16, 47:18, 47:22, 48:4
**bartender** [1] - 47:21
**bartenders** [1] - 46:21
**base** [1] - 59:25
**based** [9] - 29:13, 32:10, 32:16, 33:15, 33:18, 40:6, 45:3, 46:24, 49:25, 50:15, 53:8, 53:9, 53:11, 71:25, 73:17
**basic** [2] - 12:19
**basis** [3] - 31:21, 47:11, 48:3
**beat** [1] - 35:15
**began** [2] - 36:4, 36:17
**BEHALF** [2] - 2:2, 2:6
**behind** [1] - 79:8
**beings** [1] - 59:5
**belief** [1] - 50:16
**bend** [1] - 35:17
**bending** [2] - 64:17, 71:23
**beneath** [1] - 55:18, 55:22
**bent** [2] - 71:22, 72:5
**bereft** [1] - 30:9
**best** [9] - 16:17, 16:23, 32:15, 32:16, 34:5, 51:7, 51:11, 69:7, 69:22
**better** [1] - 33:12
**beyond** [2] - 13:23, 34:4
**big** [3] - 35:3, 46:16, 47:20
**Biscayne** [1] - 2:7

# C

**bit** [3] - 13:19, 36:19, 57:10
**board** [43] - 9:18, 9:21, 9:24, 11:8, 13:7, 13:15, 14:2, 14:15, 15:12, 15:17, 15:24, 16:12, 19:6, 19:8, 20:8, 20:19, 20:21, 20:25, 21:5, 22:8, 22:20, 23:6, 23:7, 23:8, 23:23, 24:10, 24:19, 25:8, 27:18, 32:2, 33:23, 34:1, 37:23, 51:3, 52:23, 57:13, 58:6, 58:15, 59:13, 62:19, 76:20, 78:9, 79:5
**bodies** [2] - 72:24, 75:13
**body** [2] - 12:20, 44:13
**boss** [1] - 49:19
**Boulevard** [3] - 2:3, 2:7, 83:6
**bow** [1] - 64:12
**Brais** [3] - 7:24, 7:25, 8:2
**brake** [1] - 44:13
**braking** [1] - 36:2
**break** [3] - 13:18, 35:17, 64:21
**breaker** [2] - 64:11, 70:2
**breaking** [1] - 56:5
**bridge** [2] - 41:9, 41:13
**brief** [1] - 28:10
**briefly** [1] - 76:2
**bring** [8] - 3:15, 4:8, 7:6, 7:8, 10:20, 22:18, 47:8, 61:25
**brought** [3] - 16:4, 63:16, 75:18
**brown** [1] - 24:6
**buoyancy** [1] - 72:6
**business** [6] - 10:7, 10:10, 10:13, 10:17, 10:24, 12:21
**BY** [34] - 2:4, 2:8, 3:7, 3:24, 5:24, 11:13, 16:9, 16:21, 21:22, 25:21, 31:20, 36:10, 36:18, 40:19, 43:9, 43:16, 49:8, 53:21, 56:9, 59:6, 59:16, 60:24, 61:11, 62:3, 69:1, 70:9, 70:19, 73:6, 73:16, 73:22, 74:7, 74:12, 75:17, 76:1

**C.V** [2] - 7:10, 7:11
**C/O** [1] - 83:5
**calm** [2] - 42:9, 54:14
**Canaveral** [1] - 77:5
**cannot** [1] - 42:10
**captain** [4] - 18:15, 18:21, 58:11, 73:8
**Captain** [3] - 40:13, 43:12, 59:18
**CAPTAIN** [9] - 1:17, 2:13, 3:2, 80:6, 81:8, 82:14, 83:5, 83:11, 84:24
**captaining** [1] - 57:24
**captured** [1] - 6:23
**care** [6] - 14:4, 69:24, 73:23, 74:1, 74:2, 83:18
**career** [1] - 27:6
**cargo** [10] - 11:3, 12:3, 12:20, 24:7, 26:18, 44:18, 44:20, 59:5, 72:18
**Caribbean** [1] - 25:5
**Carnival** [7] - 23:15, 25:5, 74:17, 74:19, 76:3, 76:6, 79:1
**carpet** [1] - 54:18
**CASE** [2] - 1:3, 83:10
**case** [38] - 1:22, 4:19, 6:1, 6:6, 6:19, 7:7, 7:21, 7:23, 8:6, 8:19, 9:1, 9:3, 9:15, 11:20, 27:23, 28:3, 28:13, 29:3, 29:5, 31:8, 31:11, 41:10, 41:14, 42:19, 43:3, 46:22, 47:6, 50:16, 56:3, 59:18, 60:20, 61:1, 64:23, 65:3, 67:25, 71:12, 75:20
**cases** [1] - 9:7
**cast** [1] - 37:11
**casualties** [4] - 37:10, 55:4, 55:6
**casualty** [7] - 7:19, 14:14, 16:20, 31:24, 64:15, 67:23, 71:16
**caused** [10] - 30:18, 42:19, 45:17, 52:5, 55:1, 67:1, 67:5, 67:9, 69:15, 69:20
**causes** [1] - 44:7
**causing** [2] - 44:4, 68:5
**cc** [1] - 83:25
**CCTV** [2] - 6:22, 52:8

**CELEBRITY** [2] - 1:8, 83:10
**celebrity** [1] - 11:22
**Celebrity** [12] - 29:10, 31:12, 44:3, 46:18, 47:12, 49:16, 50:13, 51:2, 59:21, 60:3, 60:8, 73:9
**Celebrity's** [2] - 39:1, 39:19
**center** [1] - 72:6
**certain** [4] - 12:13, 14:3, 62:13, 69:24
**certainly** [1] - 63:23
**CERTIFICATE** [2] - 80:1, 81:1
**certify** [4] - 80:5, 81:7, 82:6, 84:21
**CERTIFY** [1] - 80:8
**CFR** [1] - 13:3
**chains** [1] - 73:8
**challenging** [1] - 63:2
**chance** [1] - 67:23
**CHANEZ** [40] - 3:18, 4:22, 5:2, 5:8, 5:12, 5:15, 5:17, 5:23, 11:11, 16:1, 16:14, 31:16, 36:5, 36:13, 40:11, 43:8, 43:11, 49:2, 53:18, 53:21, 56:9, 59:6, 59:16, 60:24, 61:9, 61:11, 61:22, 62:3, 68:23, 70:7, 70:14, 73:6, 73:16, 73:22, 74:7, 74:12, 75:17, 75:23, 79:15, 83:5
**Chanez** [3] - 2:4, 2:14, 2:15
**change** [1] - 56:12
**CHANGE/ CORRECTION** [1] - 84:6
**changes** [2] - 54:18, 84:3
**charge** [1] - 58:5
**charter** [1] - 7:18
**check** [2] - 4:23, 5:7
**checking** [1] - 21:6
**checklist** [2] - 78:19, 78:22
**circuit** [1] - 35:8
**class** [2] - 13:3, 13:4
**clear** [1] - 64:12
**client** [2] - 11:6, 76:6
**close** [1] - 62:16
**closed** [1] - 35:8
**club** [1] - 34:18
**coached** [1] - 31:5
**code** [12] - 12:24,

13:2, 13:3, 13:13, 13:20, 13:25, 32:14, 37:1, 37:3, 37:4, 37:20, 38:7
**College** [1] - 27:3
**collide** [1] - 64:22
**collided** [1] - 66:23
**collision** [2] - 64:23, 65:6, 68:1
**collisions** [3] - 55:9, 64:9, 71:18
**comfortable** [2] - 40:5, 40:7
**commander** [1] - 26:25
**comment** [1] - 23:19
**commercial** [5] - 26:18, 27:10, 32:23, 58:19, 72:18
**Commission** [2] - 81:17, 82:19
**commission** [2] - 27:5, 81:17
**common** [4] - 34:5, 51:8, 51:10
**companies** [1] - 17:7
**company** [7] - 12:25, 17:6, 22:6, 38:12, 38:14, 38:18, 40:4
**compare** [1] - 28:22
**completed** [1] - 56:19
**completely** [1] - 72:4
**compliance** [1] - 13:2
**compliant** [1] - 3:16
**concerned** [2] - 79:9, 83:17
**concerning** [6] - 23:24, 29:25, 34:2, 37:6, 37:22, 44:6
**concerns** [3] - 13:6, 41:6, 44:2
**conclude** [2] - 83:15, 83:18
**concluded** [1] - 79:18
**condition** [2] - 34:7, 37:19
**conditions** [4] - 27:4, 41:25, 62:15, 79:12
**conduct** [3] - 13:11, 13:12, 22:20, 49:20, 50:22, 50:24
**conducted** [10] - 9:24, 11:8, 14:21, 16:5, 16:19, 20:23, 39:5, 46:10, 56:5, 76:16
**conducting** [5] - 19:12, 32:7, 49:18, 50:15, 51:3
**conferenced** [1] - 28:14

**confines** [1] - 15:14
**connected** [1] - 80:10
**constantly** [1] - 54:19
**consult** [2] - 11:7, 74:16
**consultant** [2] - 10:18, 22:19
**consulted** [2] - 11:17, 16:24
**consulting** [1] - 12:3
**consumption** [5] - 46:11, 46:19, 47:13, 48:1, 49:6
**contain** [2] - 6:18, 60:11
**container** [1] - 27:15
**continues** [1] - 44:14
**contract** [1] - 21:17
**contributing** [1] - 43:23
**contributory** [1] - 43:4
**control** [2] - 12:21, 13:10
**convenience** [1] - 83:16
**conventions** [1] - 11:3
**Cook** [1] - 10:22
**copies** [1] - 28:2
**copy** [4] - 6:4, 7:2, 7:6, 7:8
**CORINNE** [2] - 80:15, 81:16
**Corinne** [3] - 1:19, 80:4, 83:24
**correct** [58] - 4:17, 6:17, 8:1, 8:12, 8:13, 9:9, 9:12, 9:13, 9:19, 9:20, 9:23, 10:1, 10:5, 10:6, 11:14, 11:21, 13:22, 14:12, 17:5, 17:11, 20:21, 22:9, 24:10, 24:11, 24:19, 25:23, 25:25, 26:2, 26:6, 26:11, 26:12, 26:19, 26:22, 27:12, 27:15, 33:11, 36:12, 39:10, 44:16, 47:19, 51:22, 53:13, 53:15, 54:8, 57:24, 59:21, 60:9, 62:7, 64:23, 66:19, 66:23, 67:2, 73:21, 74:10, 75:22, 76:22, 77:10, 84:23
**correction** [1] - 84:4
**corrections** [2] - 82:9, 84:22
**corrective** [9] - 14:12, 21:14, 36:24, 37:13, 37:22, 38:15, 75:5,



75:8, 77:21
**counsel** [6] - 3:18, 6:3, 28:7, 56:11, 80:9, 80:10
**Counsel** [3] - 4:22, 60:1, 83:25
**County** [1] - 8:4
**COUNTY** [3] - 80:3, 81:4, 82:3
**couple** [4] - 18:19, 38:4, 48:24, 53:18
**course** [4] - 5:16, 12:20, 38:2, 72:21
**courses** [3] - 12:14, 12:16, 29:25
**COURT** [1] - 1:1
**court** [5] - 6:1, 6:8, 40:8, 61:4, 61:7
**crane** [1] - 27:14
**create** [3] - 4:18, 44:8, 69:25
**created** [9] - 30:19, 31:23, 37:19, 45:11, 56:22, 64:24, 67:8, 67:10, 71:14
**creates** [1] - 75:10
**creating** [1] - 35:20
**crew** [21] - 13:16, 14:18, 14:22, 19:8, 32:22, 33:7, 33:24, 39:14, 49:17, 49:22, 50:18, 56:17, 57:12, 58:6, 58:9, 68:12, 74:5, 75:9, 76:10, 76:17, 77:15
**cribbage** [1] - 27:19
**crisis** [2] - 12:21, 13:10
**critiquing** [2] - 39:3, 39:5
**Cross** [1] - 2:14
**CROSS** [1] - 53:20
**Cross-examination** [1] - 2:14
**CROSS-EXAMINATION** [1] - 53:20
**crowd** [2] - 12:21, 13:10
**Cruise** [5] - 17:1, 23:15, 47:12, 74:19, 76:7
**cruise** [64] - 9:12, 9:15, 10:3, 11:16, 12:22, 13:20, 16:6, 16:25, 17:9, 17:16, 18:13, 20:2, 20:4, 20:5, 20:20, 23:6, 24:12, 25:1, 25:3, 26:5, 26:21, 30:3,

32:11, 32:17, 33:13, 35:15, 40:23, 42:14, 43:14, 46:14, 46:23, 47:2, 47:9, 47:21, 50:5, 51:5, 51:6, 51:13, 51:15, 51:18, 52:22, 54:1, 54:4, 54:7, 54:11, 57:5, 57:24, 58:22, 59:7, 59:13, 61:15, 62:5, 62:19, 63:10, 63:20, 69:12, 69:15, 70:12, 70:18, 71:7, 73:18, 79:3, 79:4, 79:9
**CRUISES** [1] - 1:8
**Cruises** [4] - 59:21, 60:4, 60:8, 74:17
**cruises** [2] - 17:18, 25:2
**crux** [1] - 73:13

**D**

**DADE** [3] - 80:3, 81:4, 82:3
**Dade** [1] - 8:4
**dangerous** [14] - 14:7, 34:12, 34:19, 61:16, 61:20, 63:20, 64:2, 64:7, 64:14, 64:22, 68:3, 70:11, 71:6, 71:9
**Darren** [1] - 2:8
**date** [3] - 41:17, 46:19, 47:14
**DATED** [1] - 80:12
**dealing** [2] - 5:22, 58:20
**deals** [2] - 13:15, 30:10
**Dear** [1] - 83:11
**decelerate** [1] - 44:4
**decelerated** [2] - 36:12, 45:8
**decelerating** [2] - 45:6, 45:17
**deceleration** [2] - 44:6, 68:5
**deck** [5] - 34:8, 55:18, 55:22, 64:10, 64:12
**deemed** [1] - 21:12
**DEFENDANT** [1] - 2:6
**Defendant** [1] - 1:9
**Defendant's** [4] - 21:19, 21:20, 25:18, 25:19
**DEFENDANT'S** [1] - 2:20
**degree** [1] - 27:4

**department** [13] - 19:15, 19:21, 20:2, 22:16, 23:18, 24:9, 24:16, 76:18, 76:20, 77:25, 78:2, 79:3, 79:9
**departments** [3] - 19:19, 20:3, 76:17
**depo** [2] - 8:20, 8:22
**deponent** [1] - 83:13
**deposed** [2] - 8:11, 8:16
**DEPOSITION** [1] - 1:17
**deposition** [15] - 3:14, 3:21, 4:1, 4:16, 4:23, 4:25, 5:4, 7:13, 7:21, 50:1, 79:17, 80:6, 83:19, 83:20, 84:22
**Deposition** [2] - 1:22, 83:14
**depositions** [2] - 8:8, 8:16
**describe** [2] - 58:14, 58:15
**designated** [4] - 12:23, 15:22, 60:19, 60:25
**detail** [2] - 13:23, 15:3
**detailed** [2] - 15:5, 78:17
**detailing** [1] - 32:4
**determine** [2] - 65:9, 74:5
**determined** [2] - 63:11
**develop** [1] - 77:22
**developed** [2] - 30:19
**dictionary** [1] - 66:10
**different** [9] - 12:2, 29:7, 30:21, 54:16, 55:20, 55:25, 56:2, 65:23, 72:4
**Direct** [1] - 2:14
**DIRECT** [1] - 3:6
**direction** [1] - 28:6
**directly** [2] - 20:11, 20:13
**director** [4] - 20:4, 24:13, 40:24, 79:3
**disagree** [1] - 13:8
**discovery** [1] - 59:17
**discuss** [4] - 22:17, 24:5, 28:19, 57:18
**discusses** [1] - 52:23
**discussing** [1] - 22:15
**discussion** [2] - 22:7, 69:11
**discussions** [1] - 28:12
**Disney** [1] - 25:5

**dispute** [1] - 72:19
**distance** [6] - 34:25, 35:8, 35:13, 71:22, 72:3, 72:4
**distances** [1] - 72:1
**DISTRICT** [2] - 1:1, 1:2
**dive** [1] - 15:2
**DIVISION** [1] - 1:2
**docked** [2] - 41:23, 41:24
**document** [5] - 29:17, 31:14, 40:9, 40:10, 41:1
**documentation** [3] - 4:12, 39:25, 78:24
**documents** [5] - 3:16, 4:8, 4:14, 43:6, 59:20
**done** [5] - 22:24, 32:23, 56:23, 57:9, 79:15
**doors** [1] - 24:8
**down** [8] - 13:18, 15:2, 22:15, 45:22, 45:25, 57:13, 58:14, 64:21
**drink** [2] - 46:16, 48:20
**drinking** [5] - 48:11, 48:15, 48:16, 48:17, 48:23
**drinks** [3] - 47:3, 48:5, 48:12
**dry** [1] - 34:21
**duces** [2] - 3:15, 4:2
**duly** [2] - 3:3, 81:9
**during** [2] - 15:4, 50:5
**duties** [3] - 12:23, 19:5, 31:6
**duty** [5] - 14:4, 58:1, 59:12, 69:24, 74:2
**dynamic** [4] - 32:25, 42:12, 54:12, 55:13
**dynamics** [7] - 44:23, 71:21, 71:24, 72:1, 72:10, 72:13, 72:22

**E**

**e)"...Any** [1] - 84:3
**earliest** [1] - 83:16
**early** [1] - 18:2
**easily** [1] - 35:21
**easy** [1] - 54:21
**educate** [1] - 75:9
**education** [4] - 44:5, 44:8, 45:2, 75:19
**effective** [1] - 68:18
**efficient** [1] - 19:13
**efforts** [1] - 69:7

**eight** [2] - 9:7, 25:2
**either** [3] - 11:19, 51:12, 62:2
**element** [1] - 16:18
**employ** [1] - 76:5
**employee** [2] - 10:15, 80:9, 80:9
**employees** [3] - 16:7, 46:18, 47:13
**employment** [3] - 23:12, 26:17, 27:1
**enable** [1] - 54:24
**enabled** [5] - 31:24, 67:10, 69:9, 71:16, 74:4
**enables** [1] - 68:9
**enclosed** [1] - 23:2
**encompass** [1] - 24:2
**encounter** [1] - 56:2
**encourage** [4] - 30:19, 54:23, 67:14, 67:22
**encouraged** [10] - 35:10, 44:3, 45:14, 46:12, 46:13, 47:13, 48:1, 64:15, 69:10, 71:5
**encouragement** [1] - 41:7
**encouraging** [3] - 34:9, 46:18, 75:2
**end** [2] - 35:2, 66:17
**engage** [8] - 14:6, 14:19, 21:13, 32:24, 37:9, 43:18, 51:19, 75:7
**engaged** [1] - 31:25
**engineered** [1] - 34:14
**ensure** [2] - 14:4, 76:14
**ensured** [1] - 21:1
**ensuring** [3] - 19:9, 19:11, 38:10
**entail** [1] - 78:13
**entered** [1] - 84:3
**entertainment** [21] - 9:18, 10:4, 11:8, 13:7, 14:1, 15:12, 15:16, 15:18, 15:21, 19:15, 19:19, 20:2, 20:21, 22:8, 23:18, 24:9, 27:18, 32:2, 52:23, 74:24, 77:24
**entire** [1] - 27:6
**entirety** [1] - 18:12
**environment** [16] - 14:5, 32:25, 33:3, 34:14, 34:25, 36:23, 38:25, 45:11, 54:20, 55:14, 61:18, 62:1, 62:9, 76:15, 77:18,



79:7
**environments** [1] - 56:1
**equipment** [7] - 19:9, 24:6, 31:3, 76:13, 77:16, 79:8
**ergonomics** [1] - 36:21
**ERRATA** [1] - 84:1
**errata** [1] - 82:10
**escapes** [1] - 8:19
**Esquire** [2] - 2:4, 2:8
**ESQUIRE** [1] - 83:5
**essentially** [2] - 13:16, 78:19
**establish** [1] - 38:14
**established** [1] - 21:2
**estimate** [2] - 53:7, 53:11
**evening** [1] - 28:10
**event** [1] - 56:5
**everywhere** [2] - 47:4, 74:23
**evidence** [12] - 42:25, 43:5, 43:24, 47:11, 47:17, 52:4, 65:20, 65:25, 66:18, 66:21, 66:22, 66:25
**evolution** [1] - 64:14
**exactly** [4] - 13:24, 59:7, 66:14, 72:12
**Examination** [4] - 2:14, 2:15, 2:15, 2:16
**examination** [2] - 2:14, 83:12
**EXAMINATION** [5] - 3:6, 53:20, 61:10, 73:5, 75:24
**examined** [1] - 3:4
**excluded** [2] - 61:4, 61:7
**exclusive** [2] - 6:20, 47:17
**Exhibit** [4] - 21:19, 21:20, 25:18, 25:19
**EXHIBITS** [1] - 2:17
**exist** [3] - 16:8, 33:11, 40:2
**exists** [3] - 33:17, 57:22, 64:24
**expect** [2] - 32:3, 49:19
**expectation** [1] - 35:1
**experience** [16] - 18:13, 26:4, 27:10, 32:1, 44:6, 45:2, 46:14, 47:8, 55:10, 57:23, 72:17, 73:2, 73:18, 75:1, 75:12,

75:19
**experienced** [1] - 75:4
**expert** [15] - 5:21, 5:25, 6:5, 6:6, 9:5, 9:6, 9:14, 10:2, 10:21, 15:23, 16:5, 27:23, 60:12, 60:19, 72:16
**expertise** [6] - 10:20, 24:4, 29:7, 36:20, 68:8, 68:10
**experts** [4] - 5:13, 5:18, 28:3, 28:13
**expires** [1] - 82:19
**Expires** [1] - 81:17
**explain** [1] - 54:10
**explodes** [1] - 64:20
**eye** [2] - 79:11, 79:12

## F

**F.R.C.P** [1] - 84:2
**facility** [1] - 13:1
**fact** [18] - 4:7, 29:14, 30:11, 30:12, 30:13, 31:9, 31:23, 33:10, 33:21, 40:1, 45:3, 47:16, 47:18, 50:16, 63:21, 69:3, 71:15, 72:19
**factors** [2] - 36:21, 37:7
**facts** [4] - 8:21, 9:3, 33:18, 65:2
**failed** [6] - 29:11, 31:12, 39:15, 49:17, 50:14, 51:2
**failure** [9] - 30:24, 31:3, 39:8, 39:12, 39:19, 39:21, 40:9, 68:12, 69:4
**fair** [1] - 53:25
**fall** [25] - 23:1, 35:21, 35:25, 36:17, 37:18, 37:22, 45:18, 46:2, 46:4, 48:18, 49:1, 52:5, 52:13, 52:14, 53:2, 54:21, 65:18, 66:12, 67:1, 67:9, 67:10, 67:15, 67:17, 72:7, 72:14
**fallen** [3] - 46:6, 67:12, 70:23
**falls** [5] - 54:22, 55:1, 55:3, 55:6, 64:8
**familiar** [1] - 16:23
**familiarization** [1] - 33:7
**far** [6] - 4:13, 10:20,

23:1, 47:25, 53:5, 79:9
**fast** [2] - 35:17, 64:15
**fault** [2] - 48:18, 49:1
**federal** [7] - 6:1, 6:8, 6:10, 40:8, 60:20, 60:25, 61:4
**feet** [2] - 53:7, 54:15
**fell** [18] - 45:14, 45:25, 46:5, 52:10, 52:12, 52:14, 52:16, 65:12, 65:14, 65:17, 66:1, 66:2, 66:3, 66:5, 66:16, 66:17
**FF** [1] - 81:17
**figure** [1] - 70:10
**file** [1] - 83:19
**filed** [1] - 1:22
**filled** [1] - 43:14
**final** [1] - 56:5
**financially** [1] - 80:10
**fine** [3] - 5:10, 5:19, 62:6
**fire** [2] - 21:1, 21:3
**firm** [1] - 11:24
**firms** [2] - 11:20, 11:25
**first** [5] - 3:3, 17:22, 35:25, 39:17, 56:16
**fitness** [1] - 13:16
**five** [5] - 8:9, 8:12, 8:23, 23:14, 27:13
**five-person** [1] - 23:14
**flag** [3] - 10:21, 11:2, 12:3
**Flagler** [1] - 83:1
**flat** [1] - 42:9
**flip** [1] - 22:1
**floor** [11] - 34:8, 34:18, 34:20, 41:20, 42:5, 51:21, 52:2, 53:6, 53:10, 54:18
**flooring** [1] - 56:2
**floors** [1] - 54:17
**FLORIDA** [4] - 1:2, 80:2, 81:3, 82:2
**Florida** [11] - 1:13, 1:19, 1:21, 2:8, 10:9, 53:24, 80:4, 80:15, 81:16, 82:19, 83:2
**focus** [1] - 22:9
**follow** [7] - 51:1, 51:2, 53:19, 61:12, 63:6, 63:18, 73:7
**follow-up** [2] - 51:1, 61:12
**follow-ups** [2] - 53:19, 73:7
**followed** [2] - 18:5, 18:8

**following** [1] - 35:6
**follows** [1] - 3:4
**footage** [2] - 6:22, 52:8
**footing** [1] - 42:21
**footwear** [2] - 62:25, 63:14
**FOR** [1] - 2:17
**force** [1] - 59:2
**foregoing** [3] - 80:7, 82:7, 84:21
**FOREMAN** [1] - 2:6
**forgive** [1] - 23:11
**form** [23] - 11:11, 16:1, 31:16, 36:5, 36:13, 40:11, 40:14, 43:8, 43:11, 49:2, 56:6, 58:25, 59:14, 61:22, 68:23, 70:7, 70:15, 73:12, 73:20, 73:25, 74:11, 75:15, 84:3
**formal** [1] - 36:23
**format** [3] - 6:8, 6:10, 28:7
**formulate** [2] - 33:12, 77:21
**Fort** [2] - 12:12, 53:24
**forth** [1] - 82:10
**forward** [21] - 35:19, 44:4, 44:14, 45:5, 45:10, 45:18, 45:25, 46:4, 52:10, 52:16, 65:14, 65:15, 66:1, 66:2, 66:5, 66:6, 66:16, 68:5, 71:22, 72:7
**four** [4] - 18:6, 18:10, 18:18, 23:14
**four-person** [1] - 23:14
**FPR** [1] - 83:24
**frankly** [1] - 29:2
**freighters** [1] - 27:15
**FRIEDMAN** [39] - 2:6, 3:7, 3:24, 5:1, 5:5, 5:11, 5:14, 5:16, 5:20, 5:24, 11:13, 16:9, 16:21, 21:22, 25:21, 31:20, 36:10, 36:18, 40:19, 43:9, 43:16, 49:8, 53:16, 56:6, 58:25, 59:14, 60:21, 69:1, 70:9, 70:19, 73:3, 73:12, 73:20, 73:25, 74:11, 75:15, 76:1, 79:13, 79:16
**Friedman** [4] - 2:8, 2:14, 2:15, 2:16
**full** [3] - 12:18, 17:16,

35:14
**full-mission** [1] - 12:18
**fully** [1] - 77:6
**function** [1] - 35:3
**funds** [1] - 10:24
**FURTHER** [2] - 75:24, 80:8

## G

**Galleria** [2] - 2:3, 83:6
**game** [39] - 9:21, 15:4, 15:23, 16:6, 16:24, 21:5, 21:9, 22:17, 23:5, 23:7, 24:19, 24:21, 24:22, 25:7, 25:9, 25:14, 29:22, 30:14, 31:13, 32:4, 46:10, 47:14, 47:18, 48:2, 48:24, 49:13, 49:18, 49:20, 50:10, 50:15, 50:18, 50:24, 53:2, 56:25, 57:4, 66:7, 71:4, 74:13
**games** [13] - 10:4, 11:8, 13:6, 14:1, 20:8, 23:19, 23:25, 24:1, 24:10, 52:23, 78:8, 79:5, 79:6
**Gaucho** [1] - 20:25
**general** [1] - 60:13
**generalities** [1] - 60:14
**generally** [4] - 37:17, 61:19, 70:12
**generic** [2] - 14:25, 22:25
**gentleman** [1] - 34:2
**gentlemen** [1] - 57:15
**given** [4] - 8:9, 28:6, 84:4, 84:22
**GM** [1] - 42:15
**God** [1] - 55:8
**graduated** [1] - 27:3
**granted** [1] - 27:5
**Grassini** [3] - 1:19, 80:4, 83:24
**GRASSINI** [2] - 80:15, 81:16
**gravity** [1] - 72:6
**great** [1] - 4:21
**greater** [1] - 59:4
**grounded** [1] - 7:19
**group** [1] - 70:22
**guest** [5] - 29:12, 39:20, 51:19, 73:19, 73:24
**guests** [3] - 62:21,



74:3, 75:2
**guidance** [9] - 11:1, 29:19, 30:9, 39:13, 40:18, 41:2, 41:3, 49:24, 50:12
**guide** [1] - 40:15
**guidelines** [5] - 15:9, 15:13, 15:14, 32:8, 52:21
**guides** [1] - 40:15

## H

**hand** [2] - 14:22, 81:10
**handling** [5] - 11:3, 12:18, 12:20, 24:6, 24:7
**happy** [1] - 28:25
**hard** [1] - 45:20
**hatch** [1] - 57:8
**hatches** [2] - 23:2, 24:7
**hazard** [2] - 30:10, 57:22
**hazardous** [4] - 38:9, 38:11, 41:7, 75:6
**hazards** [2] - 37:15, 56:21
**head** [1] - 64:19
**height** [1] - 53:10
**heightened** [1] - 59:12
**held** [3] - 47:16, 47:18, 48:4
**help** [2] - 9:11, 77:21
**helped** [1] - 60:18
**hereby** [3] - 80:5, 82:6, 84:21
**herein** [1] - 84:23
**hereto** [1] - 82:10
**hi** [1] - 40:16
**hire** [1] - 11:4
**hired** [3] - 11:7, 54:3, 74:16
**history** [2] - 29:19, 30:4
**holes** [1] - 24:7
**HOLIDAY** [2] - 17:24, 18:4
**home** [1] - 7:1
**honestly** [1] - 66:16
**hopefully** [1] - 62:25
**horseplay** [1] - 32:24
**hosting** [3] - 29:12, 31:13, 39:20
**Hugo** [1] - 2:4
**HUGO** [1] - 83:5
**human** [10] - 35:10, 36:21, 37:7, 44:21,

59:5, 72:1, 72:9, 72:13, 72:15, 72:22
**hurt** [1] - 55:8
**hypothetical** [1] - 65:2
**hypothetically** [2] - 56:10, 56:24

## I

**idea** [6] - 37:14, 41:3, 41:19, 43:18, 54:11, 70:1
**identical** [3] - 28:17, 29:1, 29:2
**identification** [2] - 21:21, 25:20
**IDENTIFICATION** [1] - 2:17
**ignorance** [1] - 26:24
**immediate** [1] - 50:20
**impacts** [1] - 13:25
**implementation** [1] - 38:15
**improper** [1] - 30:15
**improperly** [1] - 30:14
**improved** [1] - 23:10
**improving** [1] - 38:13
**IN** [2] - 83:10, 84:2
**INC** [1] - 1:8
**incident** [2] - 54:24, 75:20
**include** [1] - 38:10
**including** [2] - 38:16, 74:24
**inclusive** [1] - 8:15
**income** [1] - 12:5
**increase** [1] - 67:22
**indicate** [1] - 56:19
**indicates** [1] - 26:9
**individual** [6] - 7:21, 16:18, 41:4, 50:3, 50:12, 50:17
**individual's** [1] - 35:16
**individually** [1] - 5:21
**individuals** [7] - 12:24, 44:3, 44:7, 68:14, 76:20, 76:23, 79:2
**induction** [2] - 33:24, 58:13
**industry** [5] - 51:2, 51:5, 54:7, 54:8, 55:11
**inform** [1] - 32:22
**information** [4] - 28:18, 29:5, 33:17, 40:6
**inherent** [1] - 67:6

**inherently** [5] - 34:11, 34:19, 61:16, 61:20, 64:6
**initiate** [1] - 39:15
**injured** [3] - 25:15, 47:15, 69:25
**injuries** [2] - 54:22, 55:1
**injury** [3] - 30:11, 30:13, 54:24
**instance** [1] - 67:7
**instead** [1] - 56:25
**instructing** [1] - 58:9
**instruction** [1] - 11:2
**instructor** [4] - 10:25, 12:6, 12:8, 12:9
**insufficient** [1] - 68:16
**intended** [1] - 38:16
**interested** [1] - 80:10
**international** [1] - 11:3
**interview** [1] - 76:24
**interviewed** [3] - 77:15, 77:24, 78:7
**invalid** [1] - 3:23
**investigate** [1] - 38:20
**investigated** [1] - 38:12
**involve** [2] - 22:10, 58:8
**involved** [7] - 9:12, 9:18, 18:21, 19:18, 35:4, 35:9, 58:11
**involving** [1] - 10:4
**ISLAND** [5] - 17:22, 17:24, 17:25, 18:4, 18:16
**Islands** [1] - 10:22
**ISM** [11] - 13:2, 13:3, 13:13, 13:20, 13:25, 32:14, 37:1, 37:3, 37:4, 37:20, 38:7
**ISPS** [1] - 12:24
**issue** [1] - 33:21
**issued** [1] - 4:1
**items** [3] - 59:23, 60:2, 60:6
**itself** [1] - 15:7

## J

**JANET** [2] - 1:5, 83:10
**JEANNIE** [1] - 83:1
**jeffrey** [1] - 3:13
**JEFFREY** [9] - 1:17, 2:13, 3:2, 80:6, 81:8, 82:14, 83:5, 83:11, 84:24
**job** [8] - 23:16, 74:19,

76:2, 76:14, 78:10, 78:12, 78:13, 78:15
**jobs** [6] - 13:17, 58:15, 76:11, 76:12, 76:16, 77:18
**JSA** [1] - 23:16
**judge** [1] - 40:8
**JURAT** [1] - 82:1

## K

**keep** [1] - 69:7
**Keith** [2] - 7:25, 8:2
**knowledge** [1] - 55:11
**Krug** [9] - 25:14, 35:24, 45:8, 47:15, 50:2, 52:5, 53:5, 65:11, 73:9
**KRUG** [3] - 1:5, 83:10
**Krug's** [1] - 50:1

## L

**lack** [5] - 39:13, 73:23, 74:1, 74:3, 74:4
**lacks** [1] - 74:8
**ladies** [1] - 57:16
**land** [1] - 55:21
**Large** [1] - 1:21, 82:19
**large** [1] - 56:16
**largest** [3] - 12:4, 12:10, 17:9
**last** [7] - 7:16, 8:9, 8:12, 8:23, 9:7, 26:20, 48:20
**lateral** [2] - 35:19, 72:6
**Lauderdale** [2] - 12:12, 53:24
**law** [1] - 12:21
**lawyer** [1] - 8:4
**layers** [1] - 33:25
**lead** [3] - 64:8
**learned** [1] - 36:22
**least** [2] - 26:16, 60:7
**leave** [1] - 21:15
**lectures** [1] - 29:25
**left** [1] - 68:3
**lesser** [1] - 59:3
**Letter** [4] - 2:20, 2:21, 21:20, 25:19
**level** [2] - 22:16, 34:21
**leveled** [1] - 42:3
**license** [1] - 27:4
**limited** [2] - 61:3, 61:6
**line** [13] - 9:15, 11:16, 16:7, 23:6, 25:3, 30:3, 32:17, 33:13,

46:23, 47:21, 51:6, 51:13, 51:18
**Line** [1] - 74:19
**Line's** [1] - 47:12
**Lines** [3] - 17:2, 23:15, 76:7
**lines** [6] - 13:21, 16:25, 17:10, 46:14, 51:5, 52:22
**LinkedIn** [5] - 2:21, 25:23, 25:24, 60:15, 60:16
**liquid** [1] - 52:1
**list** [2] - 9:10, 78:17
**live** [1] - 24:23
**LLC** [3] - 2:2, 10:12, 83:6
**loads** [1] - 44:12
**local** [2] - 3:20, 8:2
**located** [1] - 12:11
**log** [2] - 41:9, 41:13
**look** [18] - 9:17, 14:7, 14:16, 14:23, 14:24, 15:1, 16:5, 26:17, 28:8, 29:1, 51:12, 57:14, 57:16, 57:18, 57:19, 60:17, 66:10, 79:12
**looked** [6] - 29:16, 30:8, 76:12, 77:16, 77:17, 77:19
**looking** [5] - 16:16, 30:7, 53:9, 62:12, 71:13
**looks** [6] - 4:10, 6:4, 9:6, 22:3, 54:13
**lose** [8] - 36:4, 36:8, 52:18, 63:22, 63:25, 67:6, 67:19, 68:6
**lost** [4] - 36:11, 52:9, 52:15, 52:17
**Louisiana** [2] - 2:4, 83:7
**lounge** [3] - 41:20, 70:4
**lounges** [2] - 19:10, 47:3
**lowest** [2] - 14:22, 57:13
**lunch** [3] - 57:1, 57:4, 57:7

## M

**maintained** [1] - 19:9
**maintaining** [1] - 38:24
**major** [2] - 16:25, 52:22



manage [1] - 49:9
management [14] - 12:22, 13:4, 13:11, 13:14, 13:21, 32:14, 37:1, 38:9, 39:8, 39:10, 39:12, 39:21, 39:23, 39:24
manages [1] - 49:6
managing [1] - 58:19
manner [2] - 19:13, 32:8
maritime [3] - 10:18, 12:11, 24:4
Maritime [7] - 10:25, 12:6, 12:9, 23:12, 27:3, 53:23, 76:5
mark [2] - 21:19, 25:18
marked [2] - 21:21, 25:20
mass [3] - 44:13, 63:16
master [8] - 20:12, 20:14, 26:14, 57:13, 58:3, 59:11
matches [3] - 51:12, 51:14, 51:15
mate's [1] - 27:4
mates [1] - 35:15
matter [6] - 10:21, 24:4, 33:2, 57:3, 57:6, 83:15
MC [1] - 56:4
mean [19] - 10:19, 15:22, 30:14, 32:10, 33:11, 34:19, 35:6, 35:7, 36:2, 40:2, 44:23, 51:16, 52:12, 55:15, 66:9, 69:4, 70:10, 72:19, 79:10
meaning [2] - 12:2, 15:8
means [3] - 47:23, 66:10, 66:11
measures [1] - 38:16
mediate [1] - 57:19
medication [2] - 49:7, 49:10
meet [1] - 79:2
meeting [1] - 22:16
member [11] - 14:18, 14:22, 33:7, 33:24, 49:18, 49:22, 50:5, 50:18, 51:18, 57:12, 74:5
members [7] - 19:8, 32:22, 39:14, 56:17, 58:6, 58:9, 76:11
mention [1] - 32:6
mentioned [2] - 55:13, 57:23

merchant [1] - 47:9
met [2] - 76:19, 78:5
Metairie [2] - 2:4, 83:7
MIAMI [2] - 1:2, 80:3
Miami [4] - 1:13, 2:8, 7:16, 83:2
MIAMI-DADE [1] - 80:3
MICHAEL [1] - 1:5
microphone [4] - 35:18, 53:4, 64:17, 71:23
microscope [1] - 16:18
might [2] - 49:15, 56:2
mine [1] - 5:13
minor [1] - 55:7
miss [3] - 14:15, 37:11, 42:20
mission [1] - 12:18
mistakes [1] - 68:22
MITCHELL [2] - 2:2, 83:6
Mitchell [1] - 4:13
mitigate [1] - 14:9
modify [1] - 40:3
moment [1] - 45:21
momentum [1] - 72:5
months [7] - 18:2, 18:6, 18:9, 18:10, 18:14, 18:18, 23:11
mooring [1] - 24:6
morning [2] - 3:8, 3:11
most [6] - 34:15, 54:21, 54:25, 55:4, 55:6, 59:8
motion [3] - 42:13, 44:17
move [4] - 44:14, 44:20, 63:21, 63:24
moved [1] - 52:5
movement [6] - 42:14, 44:15, 64:5, 67:5, 68:2, 72:22
moving [17] - 35:18, 35:19, 41:8, 41:21, 41:22, 42:4, 42:13, 43:1, 55:17, 55:18, 55:19, 55:23, 63:5, 63:8, 63:13, 64:4, 71:18
MR [77] - 3:7, 3:18, 3:24, 4:22, 5:1, 5:2, 5:5, 5:8, 5:11, 5:12, 5:14, 5:15, 5:16, 5:17, 5:20, 5:23, 5:24, 11:11, 11:13, 16:1, 16:9, 16:14, 16:21, 21:22, 25:21, 31:16, 31:20, 36:5,

36:10, 36:13, 36:18, 40:11, 40:19, 43:8, 43:9, 43:11, 43:16, 49:2, 49:8, 53:16, 53:18, 53:21, 56:6, 56:9, 58:25, 59:6, 59:14, 59:16, 60:21, 60:24, 61:9, 61:11, 61:22, 62:3, 68:23, 69:1, 70:7, 70:9, 70:14, 70:19, 73:3, 73:6, 73:12, 73:16, 73:20, 73:22, 73:25, 74:7, 74:11, 74:12, 75:15, 75:17, 75:23, 76:1, 79:13, 79:15, 79:16
multitude [1] - 54:16
MV [1] - 12:18

## N

Name [3] - 15:23, 16:11, 21:5, 25:9, 32:5
name [9] - 3:9, 3:12, 7:20, 10:10, 11:6, 11:16, 40:17, 78:4, 78:6
names [1] - 17:21
nature [2] - 10:17, 35:11
navigation [1] - 24:5
Navy [2] - 26:25, 27:6
near [2] - 14:15, 37:11
necessarily [2] - 15:15, 30:14, 33:16
necessary [1] - 37:12
need [2] - 15:13, 71:14
needed [1] - 6:15
needs [1] - 33:5
negative [1] - 4:9
negotiation [1] - 21:17
never [21] - 4:5, 4:7, 10:2, 11:19, 16:24, 17:9, 24:12, 24:15, 24:18, 29:3, 32:17, 39:9, 39:22, 40:9, 40:20, 56:23, 68:11, 68:20, 68:21, 69:13, 75:3
new [1] - 19:8
next [4] - 41:6, 44:2, 49:16, 63:17
night [2] - 19:10, 34:18
NO [2] - 1:3, 83:10
nobody [1] - 74:8
nonconformities [3] -

37:17, 38:8, 38:11
none [11] - 9:11, 11:10, 11:14, 11:15, 11:18, 13:5, 27:17, 27:19, 59:10, 67:4, 71:19
NONE [1] - 2:19
normally [1] - 51:17
Northeast [1] - 1:12
Northwest [1] - 10:8
Notary [3] - 1:20, 81:16, 82:18
notebook [2] - 4:10, 6:18
noted [1] - 46:10
notes [1] - 80:7
nothing [14] - 22:23, 29:15, 34:20, 40:16, 51:13, 53:14, 53:17, 61:15, 61:20, 62:18, 64:6, 73:3, 75:23, 79:13
Notice [1] - 1:19
notice [5] - 3:25, 4:5, 9:11, 24:8, 83:20
noticed [1] - 3:14
notify [1] - 32:22
number [1] - 57:8
numerous [1] - 58:17
nutshell [1] - 58:4

## O

o'clock [1] - 3:20
oath [1] - 83:13
OATH [1] - 81:1
object [17] - 11:11, 16:1, 31:16, 36:5, 36:13, 40:11, 43:8, 43:11, 44:14, 49:2, 61:22, 66:25, 68:23, 70:7, 70:14, 73:12, 74:11
objection [7] - 16:14, 56:6, 58:25, 59:14, 73:20, 73:25, 75:15
objective [1] - 38:13
objects [1] - 64:9
observed [7] - 23:21, 35:12, 65:7, 66:24, 67:3, 74:21, 76:10
observing [1] - 19:11
obstacle [1] - 66:12
obstacles [2] - 54:21, 56:1
obviously [1] - 50:25
occasions [1] - 58:17
occur [7] - 16:20, 31:24, 54:22, 54:24,

55:1, 71:19
occurred [8] - 30:11, 30:13, 38:19, 65:4, 67:4, 68:12, 69:4, 75:21
occurrences [1] - 38:9
occurs [1] - 57:5
OF [12] - 1:2, 1:17, 2:2, 2:6, 80:1, 80:2, 80:3, 81:1, 81:3, 81:4, 82:2, 82:3
offer [1] - 13:4
offering [2] - 47:3, 48:5
office [2] - 5:3, 83:16
officer [12] - 12:25, 13:1, 17:2, 18:25, 19:1, 19:6, 26:10, 43:15, 47:9, 58:13, 58:17, 75:13, 84:4
officers [1] - 19:3
official [1] - 81:10
oil [4] - 34:8, 34:21, 52:2, 55:9
ON [2] - 2:2, 2:6
one [2] - 8:11, 8:16, 10:11, 17:9, 18:9, 19:17, 19:24, 22:21, 24:18, 26:3, 27:3, 29:16, 41:1, 44:5, 44:25, 60:21, 61:12, 64:3, 71:2, 77:1, 77:3, 77:8
One [2] - 2:3, 83:6
one-page [1] - 41:1
open [1] - 64:12
operated [1] - 52:24
opine [1] - 46:8
opinion [40] - 29:10, 30:5, 31:11, 31:22, 33:4, 33:13, 33:15, 33:19, 33:20, 39:7, 39:17, 40:3, 41:6, 43:10, 43:25, 44:2, 44:9, 44:19, 45:8, 46:23, 47:5, 47:12, 48:10, 49:16, 50:13, 51:1, 51:9, 52:12, 56:3, 56:12, 59:25, 61:14, 61:16, 63:19, 68:9, 69:3, 70:11, 71:5, 71:25, 73:1
opinions [4] - 4:18, 28:19, 29:2, 75:20
opportunity [3] - 55:5, 62:11, 63:15
opposed [1] - 71:7
opposing [1] - 56:11
order [3] - 4:15, 14:20, 79:16



**original** [1] - 83:19
**otherwise** [1] - 62:18
**outside** [1] - 62:15
**overall** [2] - 24:1, 58:1
**overnight** [1] - 17:12
**oversight** [1] - 39:14
**own** [5] - 10:13, 24:3, 26:24, 48:18, 49:1
**owned** [1] - 12:11
**oxycodone** [1] - 48:25

**P**

**P.A** [1] - 2:6
**p.m** [1] - 3:20
**page** [3] - 41:1, 82:10, 84:4
**PAGE** [4] - 2:13, 2:18, 2:20, 82:1
**Page** [2] - 2:20, 2:21
**PAGE/LINE** [1] - 84:6
**pages** [3] - 56:11, 80:7, 82:7
**paid** [2] - 4:24, 5:14
**part** [12] - 21:25, 23:17, 33:6, 33:7, 36:25, 46:16, 47:20, 54:6, 58:1, 75:11, 77:23, 78:16
**PART** [1] - 84:2
**partially** [1] - 49:1
**participant** [1] - 35:13
**participants** [2] - 35:9, 53:1
**parties** [2] - 80:9, 83:21
**parties'** [1] - 80:10
**party** [1] - 83:20
**passenger** [8] - 17:3, 26:5, 26:21, 27:11, 33:1, 34:9, 47:10, 72:18
**passengers** [8] - 13:12, 44:18, 59:1, 59:8, 59:12, 62:12, 64:9, 71:24
**payment** [2] - 5:3, 11:1
**payments** [1] - 5:9
**Pecoraro** [2] - 28:14, 29:6
**Pecoraro's** [1] - 28:16
**people** [23] - 19:12, 20:7, 31:4, 34:9, 46:14, 48:14, 48:15, 52:12, 52:18, 54:20, 58:14, 64:15, 64:22, 67:14, 67:15, 68:17, 68:20, 68:21, 69:25,

70:12, 77:11, 77:24, 78:7
**per** [1] - 3:20
**perceive** [3] - 57:17, 64:13, 74:4
**percentage** [1] - 12:4
**perfectly** [1] - 44:21
**perform** [3] - 31:6, 77:18, 78:12
**performance** [1] - 76:14
**performed** [3] - 32:9, 76:12, 79:11
**performing** [1] - 76:11
**perhaps** [3] - 14:14, 47:1, 52:20
**period** [3] - 34:12, 35:3, 65:25
**PERLSTEIN** [9] - 1:17, 2:13, 3:2, 80:6, 81:8, 82:14, 83:5, 83:11, 84:24
**Perlstein** [1] - 3:13
**permitted** [1] - 46:11
**person** [11] - 23:14, 29:21, 29:22, 40:20, 50:7, 50:9, 50:14, 63:6
**person-to-person** [1] - 29:22
**personal** [3] - 73:2, 76:13, 77:16
**personally** [3] - 44:5, 76:8, 81:8
**personnel** [5] - 12:22, 12:23, 54:1, 54:4, 58:18
**phone** [3] - 8:16, 8:20, 8:22
**physiological** [1] - 73:2
**physiology** [1] - 45:4
**piece** [1] - 44:18
**pieces** [1] - 44:18
**piloting** [1] - 24:5
**pitch** [5] - 44:4, 44:7, 45:18, 46:4, 68:5
**pitched** [2] - 45:9, 45:24
**place** [4] - 14:14, 32:15, 34:19, 46:11
**placed** [1] - 68:10
**places** [1] - 34:14
**plaintiff** [6] - 4:4, 6:4, 8:5, 11:20, 11:25, 50:16
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:2
**PLAINTIFF'S** [1] - 2:18

**plaintiff's** [3] - 8:2, 11:25, 28:7
**Plantation** [1] - 10:8
**platform** [5] - 41:8, 43:2, 54:12, 62:23, 71:18
**play** [5] - 21:2, 50:18, 51:11, 51:14
**played** [20] - 9:21, 21:10, 22:17, 23:6, 23:8, 23:19, 23:25, 24:10, 24:21, 24:23, 25:4, 25:7, 27:19, 47:14, 48:2, 48:24, 49:14, 71:4, 71:7, 74:13
**playing** [1] - 21:5
**point** [5] - 36:11, 45:9, 45:16, 48:9, 59:7
**policies** [2] - 22:19, 52:22
**politely** [1] - 51:18
**pollution** [2] - 38:14, 58:3
**Port** [1] - 77:5
**position** [5] - 20:19, 26:7, 26:10, 26:20, 35:19
**positions** [1] - 26:16
**possible** [1] - 52:18
**possibly** [1] - 77:14
**potential** [2] - 64:24, 71:10
**pouring** [1] - 62:15
**PPE** [1] - 77:19
**practice** [9] - 16:17, 31:25, 32:15, 32:16, 34:7, 51:7, 57:1, 57:21, 69:22
**practices** [5] - 14:9, 14:18, 16:23, 34:5, 77:22
**premised** [1] - 63:20
**prepare** [1] - 4:15
**prepared** [6] - 31:5, 50:21, 62:24, 63:3, 63:14
**prepayment** [1] - 5:18
**presented** [4] - 33:9, 33:18, 69:9, 70:21
**presents** [1] - 15:7
**prevent** [1] - 38:16
**prevention** [2] - 38:14, 58:3
**previously** [1] - 7:11
**primarily** [3] - 19:7, 22:10, 27:10
**private** [2] - 26:17, 27:1
**privately** [1] - 12:10

**problem** [7] - 5:11, 7:3, 35:12, 42:4, 46:9, 49:12, 67:7
**procedure** [2] - 32:3, 38:19
**procedures** [5] - 22:7, 22:20, 38:10, 38:15, 58:6
**proceed** [1] - 83:19
**process** [2] - 10:24, 63:16
**processed** [1] - 48:22
**processing** [1] - 45:21
**produced** [1] - 59:24
**produces** [1] - 56:11
**professional** [2] - 75:12, 79:12
**Professional** [9] - 1:20, 10:25, 12:7, 12:10, 23:12, 53:23, 76:6, 80:5, 80:15
**profile** [3] - 25:24, 60:15, 60:16
**prohibition** [1] - 34:4
**proper** [5] - 21:1, 49:17, 50:14, 62:25, 63:14
**properly** [5] - 31:5, 56:4, 56:13, 56:20
**proprietary** [1] - 78:24
**protect** [1] - 59:12
**protection** [1] - 23:1
**protective** [2] - 76:13, 77:16
**proves** [1] - 30:24
**provide** [16] - 5:5, 5:9, 7:2, 11:1, 29:11, 29:18, 31:12, 33:13, 37:4, 39:19, 39:25, 40:4, 49:17, 50:14, 62:20
**provided** [14] - 9:5, 16:7, 27:24, 28:2, 28:11, 29:15, 29:23, 30:3, 33:16, 33:20, 39:2, 41:4, 41:12, 49:13
**PROVIDES** [1] - 84:2
**providing** [6] - 28:23, 31:15, 31:19, 49:24, 50:11, 63:23
**provision** [1] - 74:8
**Public** [3] - 1:20, 81:16, 82:18
**pull** [1] - 66:9
**pulled** [2] - 21:16
**purposes** [1] - 57:5
**pursuant** [1] - 1:21
**purview** [1] - 22:11
**put** [3] - 16:17, 24:18,

48:25
**putting** [2] - 20:8, 22:8

**Q**

**qualifications** [1] - 29:8
**qualified** [2] - 72:9, 72:16
**qualifies** [1] - 72:12
**quick** [1] - 61:12
**quickly** [1] - 64:16

**R**

**raise** [1] - 14:21
**ramps** [1] - 24:8
**ran** [5] - 29:22, 35:14, 44:23, 44:25, 45:3
**range** [1] - 48:14
**rapid** [2] - 68:4, 68:5
**rapidly** [8] - 44:4, 45:6, 45:8, 45:17, 45:24, 46:1, 46:4, 46:5
**rating** [1] - 57:13
**RE** [1] - 83:10
**reaching** [1] - 53:5
**react** [2] - 72:24, 75:13
**read** [4] - 38:3, 49:21, 82:6, 84:21
**reading** [1] - 83:18
**really** [4] - 35:17, 43:20, 46:9, 55:15
**reason** [1] - 68:3
**REASON** [1] - 84:6
**reasons** [2] - 64:3, 84:4
**receive** [2] - 3:25, 68:15
**received** [5] - 4:12, 28:4, 28:9, 30:8, 68:14
**recently** [2] - 47:1, 74:16
**recognize** [13] - 14:8, 14:17, 15:6, 15:24, 21:23, 25:22, 31:6, 34:6, 37:9, 37:14, 56:21, 67:23, 75:6
**recognized** [1] - 57:20
**reconstruction** [3] - 36:21, 36:24, 37:6
**Record** [1] - 83:25
**record** [8] - 3:9, 3:12, 3:18, 29:23, 30:4, 30:6, 31:18, 80:7
**records** [3] - 29:16,



29:20, 56:12
**RECROSS** [1] - 73:5
**Recross** [1] - 2:15
**REDIRECT** [2] - 61:10, 75:24
**Redirect** [2] - 2:15, 2:16
**reduce** [2] - 37:15, 62:11
**refer** [1] - 25:13
**reference** [1] - 83:12
**referring** [1] - 41:2
**regarding** [4] - 11:7, 22:7, 72:9, 72:13
**regardless** [1] - 67:9
**regulations** [2] - 11:2, 51:13
**reiterate** [1] - 71:14
**relative** [2] - 80:9, 80:9
**relatively** [1] - 55:7
**relevant** [1] - 72:25
**remember** [2] - 8:23, 19:24
**remove** [2] - 14:9, 57:22
**renamed** [1] - 17:24
**render** [1] - 68:9
**reoccurrence** [1] - 38:17
**repeat** [1] - 71:2
**report** [18] - 6:5, 6:6, 6:10, 7:6, 7:8, 9:5, 20:11, 20:13, 27:24, 27:25, 28:5, 28:8, 28:16, 38:12, 43:14, 77:21, 80:5
**reported** [1] - 20:15
**Reporter** [1] - 1:20, 80:5, 80:15
**REPORTER** [1] - 80:1
**reporting** [1] - 6:8
**REPORTING** [1] - 83:1
**reports** [5] - 28:2, 28:22, 29:1, 38:8, 41:16
**representing** [1] - 11:20
**request** [4] - 3:17, 4:8, 6:9, 59:17
**requested** [9] - 5:17, 27:5, 39:2, 41:11, 59:21, 60:3, 60:7, 80:6
**requests** [1] - 3:16
**require** [2] - 5:6, 37:21
**required** [1] - 33:25
**requirement** [1] - 37:8
**requirements** [2] - 13:13, 32:13
**requires** [1] - 13:14,

13:20
**research** [2] - 27:16, 55:5
**reserves** [1] - 27:7
**reservist** [1] - 27:2
**resistance** [1] - 35:20
**responses** [1] - 59:18
**responsibility** [7] - 14:4, 14:16, 20:10, 20:20, 20:24, 57:21, 59:4
**responsible** [3] - 19:7, 20:8, 58:2
**result** [2] - 31:2, 66:17
**retained** [4] - 7:23, 8:5, 8:25, 76:4
**revenue** [2] - 46:16, 47:21
**review** [10] - 22:19, 23:7, 23:18, 39:1, 41:9, 41:13, 41:16, 45:7, 52:7, 80:6
**reviewed** [12] - 4:15, 6:19, 23:15, 28:18, 29:5, 39:4, 39:9, 39:11, 39:22, 40:10, 59:17, 60:7
**reviewing** [2] - 21:9, 26:2
**roll** [2] - 42:16, 42:17
**room** [1] - 70:24
**root** [5] - 14:11, 14:13, 36:24, 37:11, 37:21
**Royal** [1] - 25:5
**RULE** [1] - 84:2
**rules** [2] - 3:20, 5:6
**run** [51] - 13:6, 14:1, 15:3, 15:24, 16:11, 16:12, 16:24, 30:14, 32:5, 32:24, 34:9, 34:12, 34:17, 34:19, 35:1, 35:10, 44:3, 45:15, 50:10, 51:7, 51:10, 51:15, 54:13, 54:14, 54:19, 56:5, 56:25, 57:4, 57:9, 58:18, 62:1, 62:12, 62:25, 63:11, 64:2, 64:12, 64:15, 69:11, 69:12, 69:18, 70:2, 70:13, 70:17, 70:23, 71:5, 72:2, 72:14, 72:20, 73:19, 75:2, 79:6
**runner** [2] - 63:1
**running** [47] - 15:12, 33:23, 34:4, 34:14, 34:23, 36:16, 40:21, 41:8, 42:4, 44:6, 44:21, 45:5, 45:6,

45:20, 48:15, 50:10, 51:22, 52:19, 54:11, 55:2, 55:20, 55:21, 57:7, 57:8, 58:9, 61:15, 61:17, 61:20, 62:5, 62:19, 63:19, 64:6, 64:7, 67:7, 70:4, 71:21, 72:1, 72:4, 72:9, 72:13, 72:22, 72:25, 73:10, 75:14, 78:9, 79:5
**Rusak** [1] - 7:24

## S

**safe** [14] - 14:5, 15:1, 19:12, 23:9, 27:17, 32:7, 38:24, 57:1, 67:13, 70:6, 76:15, 77:22
**safely** [2] - 15:24, 20:23
**safeship** [1] - 10:11
**Safeship** [1] - 10:11
**safety** [51] - 13:3, 13:14, 13:21, 17:2, 18:25, 19:1, 19:6, 19:9, 22:10, 22:15, 22:19, 22:25, 23:9, 23:16, 24:2, 26:10, 29:11, 30:2, 30:10, 31:12, 32:14, 32:19, 32:20, 32:21, 37:1, 38:9, 38:13, 39:8, 39:9, 39:11, 39:20, 39:21, 39:22, 39:24, 40:16, 43:14, 57:5, 58:1, 58:2, 58:13, 58:15, 58:17, 73:18, 74:2, 74:19, 75:12, 76:3
**sail** [1] - 77:8
**sailings** [1] - 17:12
**salvage** [1] - 27:14
**SANCHEZ** [2] - 2:2, 83:6
**Sanchez** [1] - 4:13
**saw** [8] - 21:12, 36:1, 36:7, 46:1, 46:2, 65:23, 71:24, 75:3
**scenario** [10] - 15:7, 31:24, 56:22, 67:8, 69:9, 69:12, 69:25, 70:21, 71:15, 72:2
**scenarios** [1] - 67:22
**school** [3] - 12:11, 53:22, 54:3
**scissors** [1] - 62:2
**script** [1] - 21:6

**sea** [3] - 10:23, 12:3, 62:13
**SeaEscape** [9] - 17:1, 17:4, 17:5, 18:14, 19:14, 21:15, 26:3, 32:13, 46:25
**seal** [1] - 81:10
**Seaman** [2] - 27:3
**seaman** [1] - 12:20
**seamen** [4] - 58:20, 58:23, 59:3, 59:8
**second** [5] - 17:17, 17:23, 18:11, 49:22, 50:5
**section** [2] - 22:6, 38:7
**security** [7] - 12:23, 12:25, 13:1, 18:25, 19:2, 58:2
**see** [12] - 4:21, 6:3, 7:5, 14:20, 14:24, 21:8, 25:4, 37:13, 46:3, 51:17, 62:18, 71:16
**seeing** [1] - 20:22
**seminars** [1] - 29:25
**sense** [3] - 34:5, 51:8, 51:10
**sent** [3] - 6:4, 6:9, 7:11
**sentences** [1] - 38:4
**separate** [4] - 19:2, 19:14, 19:18, 84:4
**served** [3] - 3:19, 17:19, 24:12
**Services** [1] - 10:11
**services** [1] - 22:6
**set** [1] - 82:9
**seven** [2] - 18:2, 18:9
**several** [3] - 33:25, 36:1, 36:7
**shall** [3] - 83:18, 83:19, 84:3
**shared** [2] - 4:5, 4:7
**SHEET** [1] - 84:1
**ship** [62] - 9:18, 9:22, 9:25, 10:3, 11:9, 12:17, 12:22, 16:12, 17:16, 17:17, 17:22, 17:23, 23:6, 24:5, 24:19, 37:23, 42:3, 43:1, 44:15, 46:23, 47:2, 47:9, 52:5, 54:1, 54:4, 54:8, 54:11, 57:5, 57:24, 58:10, 58:22, 59:8, 59:13, 61:15, 62:5, 62:19, 63:10, 63:20, 63:21, 63:23, 63:24, 64:2, 64:4, 64:5, 69:15, 69:16, 69:17,

69:18, 69:20, 70:12, 71:7, 72:20, 73:18, 74:20, 76:21, 77:1, 77:2, 77:3, 77:8, 77:13, 77:14
**ship's** [1] - 59:2
**ships** [15] - 9:12, 17:3, 17:13, 17:19, 25:8, 26:18, 27:15, 27:16, 34:15, 41:22, 42:14, 44:20, 69:12, 70:18
**short** [5] - 35:13, 71:21, 72:1, 72:3, 72:4
**SHORTHAND** [1] - 80:1
**shortly** [2] - 18:5, 18:8
**show** [4] - 21:18, 25:17, 28:25, 29:15
**shows** [1] - 79:10
**side** [1] - 70:24
**signature** [1] - 83:14
**signed** [1] - 56:18
**signing** [1] - 83:19
**simply** [2] - 31:13, 33:15
**simulator** [1] - 12:18
**Sincerely** [1] - 83:22
**single** [3] - 32:4, 60:11, 76:20
**sit** [2] - 51:16, 58:14
**site** [1] - 50:20
**Site** [1] - 2:20
**situation** [10] - 16:8, 30:18, 31:7, 35:20, 57:15, 64:25, 67:10, 68:11, 75:7, 75:10
**situational** [1] - 34:3
**situations** [4] - 14:7, 14:10, 38:11, 72:24
**slip** [5] - 37:18, 37:22, 55:1, 67:17, 68:1
**slippery** [1] - 51:24
**slips** [3] - 54:22, 55:3, 55:6
**slow** [1] - 45:22
**small** [1] - 42:15
**SMS** [3] - 39:1, 39:4, 52:21
**sole** [1] - 31:21
**solely** [4] - 30:5, 50:15, 51:9, 71:25
**someone** [2] - 22:18, 55:7
**sometime** [1] - 18:19
**sometimes** [3] - 67:16, 67:18, 67:21
**somewhere** [3] - 33:5, 37:25, 78:21
**soon** [1] - 35:15



**sorry** [1] - 18:24
**sort** [1] - 14:25
**sound** [2] - 9:9, 31:3
**South** [1] - 2:7
**SOUTHERN** [1] - 1:2
**space** [1] - 23:2
**specific** [10] - 16:10, 29:11, 31:13, 37:5, 37:16, 39:20, 62:20, 67:7, 69:14, 69:19
**specifically** [13] - 16:12, 23:20, 23:24, 24:1, 27:13, 37:21, 39:7, 39:16, 50:8, 71:6, 76:8, 76:12, 79:5
**speed** [2] - 35:14, 35:16
**spelling** [1] - 6:15
**spent** [2] - 26:3, 77:13
**spill** [1] - 34:20
**spillage** [1] - 52:1
**spills** [1] - 55:9
**spite** [1] - 69:7
**spy** [1] - 27:16
**SS** [2] - 80:3, 82:2
**stability** [5] - 11:4, 12:19, 24:7, 44:10, 44:11
**stable** [1] - 42:3
**staff** [3] - 20:2, 20:5, 79:4
**stage** [8] - 35:10, 36:4, 53:10, 70:2, 73:10, 73:19, 75:2, 79:8
**stairways** [1] - 51:16
**standard** [1] - 69:22
**standards** [3] - 51:2, 51:5, 54:7
**standing** [2] - 45:5, 49:20
**start** [1] - 35:2
**started** [2] - 11:5, 35:24
**State** [3] - 1:21, 81:16, 82:19
**state** [8] - 3:8, 3:11, 10:21, 11:2, 12:3, 42:10, 61:7, 62:13
**STATE** [3] - 80:2, 81:3, 82:2
**statement** [2] - 43:22, 84:4
**States** [1] - 12:11
**STATES** [1] - 1:1
**statistic** [1] - 55:5
**statistically** [1] - 55:3
**stay** [2] - 15:13, 54:6
**staying** [1] - 15:9
**stenographic** [1] -

80:7
**stenographically** [1] - 80:5
**step** [1] - 35:25
**steps** [2] - 36:1, 36:8
**stern** [1] - 64:13
**still** [1] - 68:19
**stop** [10] - 14:19, 14:23, 39:15, 57:11, 57:16, 57:18, 62:10, 62:11, 64:16, 75:8
**stopped** [1] - 74:9
**storage** [1] - 79:8
**storm** [1] - 62:16
**stowage** [3] - 11:3, 12:3, 24:6
**straight** [1] - 18:3
**Street** [1] - 83:1
**street** [1] - 70:5
**strike** [1] - 31:9
**stuff** [1] - 56:18
**styled** [1] - 83:13
**subchapter** [1] - 13:2
**subject** [3] - 10:21, 24:4, 61:13
**subordinates** [1] - 58:12
**subpoena** [1] - 3:22
**subpoenaed** [1] - 3:15
**subscribed** [1] - 82:16
**subsequent** [1] - 5:9
**substance** [1] - 84:3
**successful** [2] - 35:11, 66:6
**sudden** [2] - 63:4, 63:7
**suffered** [1] - 7:18
**sufficient** [1] - 3:21
**suggest** [1] - 83:16
**suitable** [1] - 83:17
**Suite** [5] - 1:12, 2:3, 2:7, 83:2, 83:7
**supervision** [4] - 49:17, 50:14, 50:19, 50:20
**supervisor** [2] - 40:23, 78:14
**support** [7] - 42:25, 43:5, 43:10, 43:24, 47:12, 52:4, 65:20
**supposed** [2] - 34:16, 73:18
**surface** [2] - 34:22, 42:5
**surging** [2] - 45:5, 66:6
**surprise** [1] - 28:15
**surprised** [4] - 63:4, 63:7, 63:9, 63:12
**surveying** [1] - 12:4

**surveyor** [1] - 10:22
**surveys** [2] - 11:4, 11:5
**Sworn** [1] - 82:16
**sworn** [2] - 3:4, 81:9
**system** [12] - 13:4, 13:14, 13:21, 14:6, 32:14, 38:10, 39:9, 39:10, 39:12, 39:22, 39:23, 39:24
**systems** [1] - 37:2

---

## T

**table** [1] - 47:8
**tackle** [1] - 24:6
**tankers** [1] - 27:16
**tape** [1] - 52:7
**target** [1] - 48:14
**tasked** [1] - 14:15
**teach** [7] - 12:13, 12:19, 12:24, 13:3, 53:22, 53:23, 54:3
**teaching** [1] - 13:25
**team** [2] - 23:14, 77:11
**tecum** [2] - 3:15, 4:2
**telephone** [1] - 83:16
**telephonic** [1] - 8:15
**television** [1] - 35:8
**ten** [1] - 9:7
**term** [1] - 55:16
**terms** [3] - 15:1, 21:4, 28:7
**terrazzo** [1] - 54:17
**testified** [2] - 3:4, 27:20
**testify** [3] - 42:23, 50:8, 72:9
**testimony** [3] - 43:6, 61:3, 61:6
**THE** [20] - 2:2, 2:6, 3:5, 16:4, 16:16, 31:18, 36:7, 36:15, 40:14, 43:13, 49:5, 56:7, 59:1, 59:15, 61:25, 70:17, 73:13, 73:21, 74:1, 75:16
**them..** [1] - 84:5
**themselves** [4] - 13:12, 16:19, 19:12, 35:18
**thereafter** [2] - 18:6, 18:9
**Thereupon** [4] - 3:1, 21:20, 25:19, 79:17
**they've** [3] - 48:14, 48:16, 63:15
**third** [1] - 27:4
**three** [2] - 17:18,

23:13
**three-day** [1] - 17:18
**tie** [3] - 56:5, 64:11, 70:1
**tile** [1] - 54:17
**TO** [1] - 83:5
**today** [5] - 3:22, 4:16, 15:19, 23:4, 54:13
**together** [1] - 84:22
**tomorrow** [1] - 54:14
**took** [3] - 7:21, 35:25, 83:20
**top** [1] - 35:16
**total** [2] - 9:6, 18:14
**touch** [2] - 70:24, 72:3
**towards** [5] - 73:10, 73:19, 73:23, 74:2, 75:2
**towing** [1] - 27:14
**track** [10] - 34:15, 44:23, 44:25, 45:3, 62:4, 62:5, 62:16, 62:19, 63:4, 63:7
**tracks** [1] - 34:16
**traditionally** [1] - 20:9
**train** [4] - 50:9, 53:25, 54:4, 75:9
**trained** [12] - 31:5, 50:3, 50:23, 56:4, 56:13, 56:20, 58:20, 58:22, 59:3, 59:8, 63:1
**Training** [11] - 10:25, 12:7, 12:10, 23:13, 53:24, 76:6
**training** [45] - 12:8, 13:15, 13:16, 15:11, 16:6, 19:8, 29:11, 29:15, 29:17, 29:19, 29:22, 30:2, 30:7, 30:15, 30:25, 31:12, 31:15, 31:19, 33:6, 33:25, 34:2, 36:23, 37:1, 37:5, 39:20, 41:3, 49:23, 50:4, 50:12, 50:18, 50:21, 55:10, 56:12, 58:7, 58:8, 68:12, 68:14, 68:15, 68:21, 69:5, 73:17, 74:4, 75:11, 75:19
**trainings** [1] - 15:4
**transcribed** [1] - 83:14
**transcript** [6] - 80:6, 80:7, 82:7, 83:14, 83:20, 84:21
**translates** [1] - 44:21
**treat** [1] - 12:18
**trial** [1] - 27:20
**trials** [2] - 10:23, 12:3

**trip** [8] - 17:15, 65:11, 65:13, 66:10, 66:11, 66:15, 67:15, 68:2
**tripped** [9] - 65:14, 65:21, 65:22, 65:24, 65:25, 66:1, 66:4, 66:18, 66:21
**tripping** [2] - 65:18, 66:8
**trips** [2] - 64:8, 71:19
**trivia** [3] - 56:25, 57:4, 57:8
**true** [3] - 80:7, 82:8, 84:23
**truly** [1] - 28:21
**try** [2] - 15:1, 70:16
**trying** [1] - 70:10
**Tuesday** [1] - 1:13
**Tune** [5] - 15:23, 16:11, 21:5, 25:10, 32:5
**turned** [2] - 77:20, 78:23
**two** [11] - 3:16, 12:17, 17:2, 17:13, 17:17, 20:19, 47:22, 48:12, 53:7, 57:8
**type** [12] - 10:3, 21:13, 23:22, 26:4, 26:21, 27:25, 30:10, 32:6, 34:25, 37:18, 42:14, 54:24
**types** [3] - 54:16, 55:25, 56:2

---

## U

**uncomfortable** [1] - 42:16
**under** [3] - 16:18, 22:5, 83:13
**undersigned** [1] - 81:7
**understood** [1] - 6:11
**underway** [2] - 23:13, 23:14
**union** [1] - 21:16
**United** [1] - 12:11
**UNITED** [1] - 1:1
**unless** [3] - 41:23, 42:9, 55:7
**unreasonably** [1] - 51:24
**unrelated** [1] - 6:6
**unsafe** [18] - 14:9, 14:17, 14:21, 15:2, 15:7, 21:12, 31:7, 31:25, 34:7, 54:15, 54:19, 57:17, 57:20,



**JEANNIE REPORTING** (305) 577-1705

62:14, 68:11, 75:10, 79:12

**unstable** [7] - 32:25, 41:8, 41:21, 43:1, 43:23, 62:8, 62:22

**unusual** [1] - 29:4

**unwise** [6] - 14:21, 21:13, 34:24, 42:8, 69:21, 72:20

**up** [10] - 12:4, 21:13, 45:5, 51:1, 53:5, 55:4, 61:12, 63:16, 66:9, 66:10

**ups** [2] - 53:19, 73:7

---

**V**

**VALOR** [2] - 77:4, 77:14

**Vanuatu** [1] - 10:22

**venture** [1] - 66:7

**venue** [1] - 17:16

**venues** [1] - 23:1

**vessel** [37] - 6:22, 10:3, 12:23, 12:25, 13:14, 15:17, 18:10, 18:11, 23:23, 24:2, 24:5, 24:7, 26:5, 26:21, 32:23, 34:1, 34:4, 34:9, 34:10, 34:24, 42:9, 42:12, 42:13, 43:24, 51:15, 55:17, 55:20, 56:16, 58:16, 58:20, 59:11, 63:5, 63:8, 63:13, 67:5, 68:2, 74:22

**vessels** [17] - 14:10, 17:21, 18:13, 19:3, 19:6, 20:20, 26:18, 27:10, 27:11, 27:14, 27:16, 27:18, 33:1, 72:17, 72:18, 72:19

**video** [10] - 6:20, 6:21, 25:14, 35:22, 45:7, 53:9, 53:12, 65:10, 66:24, 67:3

**virtually** [1] - 28:17

**vs** [1] - 1:7

---

**W**

**waitress** [1] - 47:22

**waitresses** [1] - 46:21

**waived** [1] - 83:19

**walk** [2] - 67:14, 72:14

**walked** [1] - 77:15

**walking** [8] - 21:11, 46:15, 47:2, 67:12, 67:13, 67:15, 67:17,

67:20

**wall** [2] - 70:24, 72:3

**wants** [1] - 84:3

**watch** [1] - 21:2

**watched** [4] - 35:22, 77:18, 79:10

**watching** [2] - 49:20, 53:12

**water** [1] - 34:21

**watertight** [1] - 24:8

**weather** [1] - 41:16

**Web** [1] - 2:20

**website** [7] - 21:24, 22:6, 24:4, 60:10, 60:11, 60:13, 60:17

**week** [5] - 23:13, 23:14, 76:25, 77:9, 77:13

**weeks** [1] - 12:17

**West** [1] - 83:1

**wet** [1] - 34:8

**whereas** [1] - 64:14

**whole** [1] - 37:14

**wife** [2] - 10:16, 25:1

**win** [1] - 35:11

**witness** [3] - 3:3, 84:3, 84:4

**WITNESS** [19] - 3:5, 16:4, 16:16, 31:18, 36:7, 36:15, 40:14, 43:13, 49:5, 56:7, 59:1, 59:15, 61:25, 70:17, 73:13, 73:21, 74:1, 75:16, 81:10

**witnessed** [6] - 25:14, 35:7, 36:15, 46:24, 53:3, 64:14

**wood** [1] - 54:18

**word** [4] - 10:11, 62:12, 66:10, 66:11

**words** [1] - 71:13

**workplace** [2] - 14:5, 37:15

**world** [2] - 17:10, 71:8

**would've** [1] - 72:3

**wow** [1] - 18:2

**writing** [2] - 33:5, 33:22

**written** [2] - 31:14, 32:3

**wrote** [2] - 6:5, 6:13

---

**Y**

**yacht** [2] - 7:18, 11:5

**year** [3] - 26:3, 47:1, 74:18

**years** [12] - 8:9, 8:12, 8:23, 9:7, 17:6,

18:14, 18:19, 26:21, 27:14, 44:24, 46:24, 51:6

**yesterday** [1] - 3:19

**YOURSELF** [1] - 83:12

**yourself** [2] - 4:15, 27:25

**yourselves** [1] - 13:11